(No. 52403.-

UNITED AIRLINES, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (John R. Bender, Appellee).

*Opinion filed May 22, 1980.*

MORAN, J., took no part.

Wiedner & McAuliffe, of Chicago (William J. Harte, of counsel), for appellant.

Jacob N. Gross, of Chicago, for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

In proceedings under the Workmen's Compensation Act (Ill. Rev. Stat. 1975, ch. 48, par. 138.1 *et seq.*) an arbitrator for the Industrial Commission found that claimant, John R. Bender, was disabled as a result of accidental injuries sustained while he was employed by respondent, United Airlines, Inc. The arbitrator awarded claimant compensation of $204.53 per week for a period of 9 4/7 weeks for temporary total incapacity, and compensation of $204.53 per week for a period of 20 weeks for permanent partial disability of the person to the extent of 4% thereof. On review, the Commission set aside the decision of the arbitrator and awarded claimant $204.53 per week for a period of 99 5/7 weeks for temporary total incapacity, and compensation of $181.20 per week for the duration of his disability for his partial incapacity to pursue his usual employment. On *certiorari,* the circuit court of Cook County confirmed the decision of the Industrial Commission, and respondent appealed to this court pursuant to our Rule 302(a) (73 Ill. 2d R. 302(a)). Respondent argues in this court that the decision of the Industrial Commission is against the manifest weight of the evidence.

In the proceedings before the arbitrator on November 29, 1976, claimant was called as the first witness. He testified that on January 2, 1964, he had been employed by respondent as a ramp serviceman. As a ramp serviceman he was responsible for the loading and unloading of aircraft. In 1969, claimant was promoted to the position of lead ramp serviceman. As a lead ramp serviceman, he was responsible for the supervision of a crew of 1 to 12 employees in addition to his responsibilities as a ramp serviceman. Claimant continued to be employed intermittently in this position through June 25, 1976.

On June 25, 1976, claimant stated that he arrived at O'Hare International Airport at 1:15 p.m. At this time, he proceeded to the United Airlines Medical Facility to meet with Dr. Gaskill, an employee of respondent, to undergo a physical examination. The purpose of this examination was to determine whether claimant was fully able to return to his duties as a lead ramp serviceman. Claimant had been unable to work as a result of an asthmatic and allergic condition. Dr. Gaskill released claimant to return to his job, and he began his shift at 2:15 p.m. Claimant stated that at approximately 4 p.m. he began to experience dizziness; he became unresponsive; his complexion became bright red; hives appeared over his entire body; his eyes itched and closed from swelling; his chest began to heave; and he found himself gasping for air. His supervisor was immediately informed of his condition, and claimant was taken from the ramp area to the radio room. When it became apparent that his condition would not improve, respondent's ramp operations crew rushed claimant by car to Resurrection Hospital. He arrived at the hospital at approximately 4:45 p.m., and emergency treatment was rendered. Intravenous fluids and a series of injections were administered to relieve claimant's condition. At approximately 7:45 p.m., he was released to the care of his physician, Dr. Marvin J. Salzmann. Dr. Salzmann had treated claimant for his asthmatic and allergic condition since September of 1973. Claimant continued treatment of his condition with Dr. Salzmann, consisting of daily medication and bi-weekly examinations.

Claimant also described the environmental conditions to which he was exposed on June 25, 1976. He stated that jet aircraft were continually arriving and departing in the vicinity of the ramp area in which he worked. In addition, this area was directly in line with the "blast engines" of aircraft located at an adjacent terminal. He

stated that it was the practice of the pilots of these aircraft to start the engines approximately 5 minutes prior to departure. Claimant stated that on June 25, 1976, he noticed dust and dirt particles in the air, the constant odor of jet fumes, and "field pollution." He stated that these were the ordinary circumstances under which he worked and that these conditions would persist throughout his shift.

Claimant also stated that on two prior occasions he had experienced "attacks" at work. The first "attack" occurred on April 2, 1974. Claimant stated that the symptoms that he had experienced on this occasion were similar to the symptoms that he experienced on June 25, 1976. On this occasion in 1974, he was taken to Resurrection Hospital and admitted for treatment. He was treated by Dr. Robert J. Lappe, a specialist in pulmonary functions. He remained hospitalized for approximately one week. He was released to the care of Dr. Salzmann and returned to work after approximately three weeks. He worked intermittently for the remainder of the year. He stated that throughout this period he experienced dizziness, difficulty in breathing, and noticed that he was allergic to substances to which he had not previously reacted. On April 29, 1975, claimant experienced substantially similar symptoms and was once again taken to Resurrection Hospital. On this occasion, he remained in the hospital for approximately three hours and was released to the care of Dr. Salzmann. Claimant continued to work intermittently through 1975.

In addition, claimant stated that he served in the United States Air Force as a clerk typist prior to his employment with respondent. While in the Air Force, he completed his general education. He also stated that he had not sought alternative employment. On cross-examination, he stated that he had never experienced an "attack" prior to working for respondent.

Claimant called as his next witness Dr. Marvin J. Salzmann, his treating physician. Dr. Salzmann stated that he was certified by the American College of Physicians and Internists as a specialist in internal medicine and that approximately one-third of his practice was devoted to the treatment of pulmonary diseases. Claimant first sought treatment from Dr. Salzmann in September 1973 for an asthmatic condition and a sore throat. On October 8, 1973, Dr. Salzmann conducted allergy tests and determined that claimant was allergic to inhalent allergins, *i.e.,* weeds, trees, molds, dust, and dog dander. Dr. Salzmann diagnosed claimant's condition as allergic rhinitis (hayfever) and asthma. Claimant was examined by Dr. Salzmann 27 times in 1974, 22 times in 1975, and 22 times in 1976. In addition to these examinations, Dr. Salzmann reviewed the medical records of claimant's admissions to Resurrection Hospital following his attacks at work. He stated that on the basis of his treatment of claimant, his review of the records of claimant's hospitalizations, his knowledge of the causes of bronchial constriction, and the medical history that he had obtained from claimant, it was his medical opinion that claimant's bronchial constrictions at work were caused by allergic asthma and chemical irritants. He stated that these chemical irritants were nitric and sulfuric acids. Dr. Salzmann also stated, in response to a hypothetical question which incorporated the facts surrounding claimant's employment, including the exposure to pollutants, that, based upon a reasonable degree of medical and surgical certainty, these asthmatic attacks might or could be causally connected to the employment. In addition, he stated that this condition totally and permanently disabled claimant from pursuing his employment as a lead ramp serviceman but did not prevent him from pursuing otherwise gainful employment with the company.

On cross-examination, Dr. Salzmann stated that he

had not tested claimant for allergic reactions to substances encountered at work and that his records did not indicate that this condition was employment related. He stated that in formulating his opinion, he did not visit claimant's work site, did not sample the air to determine which pollutants were present, did not consider the weather conditions on June 25, 1976, did not determine what type of plant life existed in the fields surrounding O'Hare Airport, did not sample the exhaust fumes of any jet engine at O'Hare Airport, and he was not aware of the substances to which petitioner could have been exposed prior to his arrival at work on June 25, 1976. Dr. Salzmann stated that he had, however, studied the properties and mechanics of jet engines while he was a flight surgeon in the United States Air Force. In addition, he stated that, at the time of arbitration, November 29, 1976, claimant's condition had improved. He attributed this improvement in part to claimant's absence from work, and in part to the medication prescribed.

On redirect examination, Dr. Salzmann stated that in order to formulate his opinion that claimant's condition was work connected, it was not necessary that he consider and test all of the factors suggested by respondent on cross-examination. He stated that to his knowledge claimant had not suffered an attack since June 25, 1976, nor had he been exposed to any jet exhaust fumes.

Claimant called as his next witness Dr. Theron G. Randolph, a specialist in internal medicine and the treatment of allergies. Dr. Randolph stated that since 1937 his work had focused primarily on the treatment of allergies. He further stated that in the course of his experience as a physician he had become familiar with the combustion of fuels from various types of engines, including aircraft engines. In addition, he stated that one of the end products of the combustion of fuel is hydrocarbon. Dr. Randolph examined claimant on two occa-

sions. On June 19, 1977, after obtaining claimant's medical history, Dr. Randolph conducted a "provocative hydrocarbon test" to determine whether claimant's allergic reactions were related to the inhalation of jet engine exhaust. Dr. Randolph described this test as the injection intradermally of diluted synthetic alcohol in varying concentrates. Three injections were administered in 20-minute intervals. Dr. Randolph stated that, after the first injection, claimant complained of dizziness. As the dosage was increased, claimant complained of drowsiness, continued dizziness, a burning sensation in his arm at the site of the injection, and heart palpatation. On claimant's second visit, he informed Dr. Randolph of his delayed reactions to the injections. Dr. Randolph did not testify regarding these reactions. He did state, however, that on the basis of the immediate and delayed responses, he was of the opinion that claimant was highly intolerant to environmental exposure to jet fuel or its combustion products. In addition, he stated that the hydrocarbon present in the test administered is substantially similar to the hydrocarbons produced by the combustion of fuel. In his opinion, the provocative hydrocarbon test is a reliable indicator of susceptibility to jet fuel or its combustion products. In response to a hypothetical question which incorporated the conditions surrounding claimant's employment, including the inhalation of jet aircraft fumes, Dr. Randolph stated that the "chemical environmental exposure" at work could, to a reasonable degree of medical and surgical certainty, be causally connected to the conditions of ill-being experienced by petitioner while working. He also stated that, in his opinion, claimant was totally and permanently disabled from pursuing his occupation as a lead ramp serviceman.

On cross-examination, Dr. Randolph stated that he did not examine the jet engines in use at O'Hare International Airport, that he had not inspected respondent's

work area, that he had not tested claimant's reaction to the residuals of combusted jet fuel, that he was not aware of the type of antipollution devices used on the jet engines on June 25, 1976, and that he was not aware of the weather conditions on June 25, 1976. Dr. Randolph also stated that there were no collateral allergic symptoms resulting from the provocative hydrocarbon testing administered to claimant. He stated that claimant did not experience burning of the eyes, discharge from the eyes, swelling of the eyes, sneezing, labored breathing, fever, blotchiness of the skin, or tachycardia as a result of the tests he conducted. He also stated that there was no evidence of wheezing, sputum, post-nasal discharge, purulent discharge, exemia or dermatitis after the injections. In addition, he stated that on the basis of claimant's medical history and the results of the hydrocarbon test, it was his opinion that claimant's condition of ill-being was related to the inhalation of jet fumes.

On redirect examination, Dr. Randolph stated that it was not necessary to examine all of the factors referred to on cross-examination to determine whether claimant was sensitive to hydrocarbon inhalation. In addition, he stated that there was little significance to the fact that claimant did not experience symptoms similar to those experienced on June 25, 1976, after injection of the synthetic alcohol. He stated that the reactions obtained vary with the route of administration. On re-cross-examination, he stated that his opinion was based upon the subjective responses given by the claimant after administration of the injections. He also stated, however, that the timing of these responses was significant in interpreting these results.

Respondent called as its only witness Dr. William Brice Buckingham, a board certified specialist in internal medicine with a subspecialty in pulmonary diseases. Dr. Buckingham examined claimant on January 21, 1977.

This examination consisted of a physical examination, chest X ray, pulmonary function testing, and a blood chemistry screen. Dr. Buckingham stated that the results of this examination showed that claimant's physical condition was within normal limits in all respects. He stated that he found no objective evidence of bronchial asthma. In addition, he stated that he found no evidence or symptomatology that related to the inhalation of hydrocarbons, nor evidence to support a finding of a chemical irritant of any kind. He also stated that the fact that claimant worked in an open area, as opposed to inside a hangar, was significant in his conclusion that there existed no evidence of a chemical irritant.

On cross-examination, Dr. Buckingham stated that the prior findings of claimant's treating physician were consistent with the diagnosis of bronchial asthma. He stated, however, that his findings were limited to the date on which he examined claimant, and he suggested that his opinion was therefore consistent with these prior findings.

On review before the Industrial Commission on December 9, 1978, claimant was the only witness to testify. He stated that he had unsuccessfully sought alternative employment. He had applied for eight positions. The types of employment sought included unskilled factory labor, manual labor, and clerical work. In each instance, claimant was prevented from pursuing these positions because of his inexperience in the field or his inability to physically perform the work. He stated that he continued to experience difficulty in breathing and, as a result, he could not exert himself beyond a rapid-paced walk. In addition, he stated that he continued under the care of Dr. Salzmann. On cross-examination, he stated that he was taking the same medication that was originally prescribed for his condition in 1973.

Respondent initially contends, assuming sufficient proof of causal connection to the employment, that the

Commission's finding that claimant was temporarily and totally disabled for a period of 99 5/7 weeks is against the manifest weight of the evidence. Respondent argues that the acute stage of claimant's condition had stabilized after 9 4/7 weeks, the period of temporary incapacity determined by the arbitrator. Respondent suggests that any additional disability is the result of claimant's pre-existing asthmatic and allergic condition. In addition, respondent suggests that claimant's efforts to secure alternative employment, and to obtain unemployment compensation, are further evidence that the temporary nature of claimant's disability had ceased.

We have consistently held that the determination of disputed facts and the drawing of reasonable inferences from the evidence in workmen's compensation cases are the province of the Industrial Commission. In reviewing findings of the Commission, the function of this court is limited to determining whether they are against the manifest weight of the evidence. This standard of review applies to findings of the Commission regarding the nature and extent of the injury. *County of Cook v. Industrial Com.* (1979), 78 Ill. 2d 320, 321.

In the present case, claimant testified on November 29, 1976, before the arbitrator that subsequent to his "attack" on April 2, 1974, he was able to resume his employment but only on an intermittent basis. This was also true following his "attack" on April 29, 1975. Claimant estimated that, from April 29, 1975, through the remainder of that year, he was able to work for a total of four months. He stated that he continued intermittently employed through June 25, 1976. Claimant was unable to work on a regular basis throughout this period despite the fact that his condition was not, as respondent describes, in an acute stage. In the proceedings before the Industrial Commission on December 19, 1978, claimant testified that he continued to experience difficulty in breathing and that he

could not exert himself beyond a rapid-paced walk. In addition, claimant stated that he had secured employment as a landscaper but that he was terminated after the first day of work because of his inability to perform the physical labor involved. While we agree with respondent that claimant's efforts to secure employment and his application for unemployment benefits may be relevant to the issue of temporary incapacity, we do not agree that we should disturb the finding of the Commission in this case. *Allis Chalmers Manufacturing Co. v. Industrial Com.* (1974), 57 Ill. 2d 257, 262; *Crow's Hybrid Corn Co. v. Industrial Com.* (1978), 72 Ill. 2d 168, 179.

Respondent argues in the alternative that claimant has failed to prove that his condition of ill-being arose out of his employment. Respondent contends that the finding of the Commission that claimant's condition was causally connected to his employment is based merely upon speculation, conjecture, or surmise. Respondent asserts that the record is silent as to what substance or chemical irritant claimant had been exposed to and that the decision of the Commission is therefore against the manifest weight of the evidence.

We agree with respondent that the burden is upon the party seeking an award to prove by a preponderance of credible evidence the elements of his claim, particularly the prerequisite that the injury complained of arose out of and in the course of his employment. (*Illinois Institute of Technology v. Industrial Com.* (1977), 68 Ill. 2d 236, 246.) It is also true, however, that it is within the province of the Industrial Commission to determine disputed questions of fact, to draw inferences from the evidence, and to resolve questions of causal relationship based upon conflicting medical testimony, and a reviewing court will not disturb the finding of the Commission unless it is against the manifest weight of the evidence. *County of Cook v. Industrial Com.* (1977), 68 Ill. 2d 24, 30.

In the present case, claimant testified that he was aware of the odor of jet fumes on June 25, 1976. In addition, he stated that the ramp area was directly in line with the "blast engines" of the aircraft located at an adjacent terminal. Claimant's treating physician testified that there was a causal relationship between the pollutants to which he was exposed on the ramp area and claimant's condition. Claimant's examining physician testified that it was his opinion that the inhalation of jet fumes was causally related to claimant's condition. He also stated that claimant was highly susceptible to the combustion products of jet fuel. We do not find that the decision of the Commission was against the manifest weight of the evidence.

For the reasons stated, we therefore affirm the judgment of the circuit court.

*Judgment affirmed.*

MR. JUSTICE MORAN took no part in the consideration or decision of this case.