(No. 57957.—

CERTI-SERVE, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Larry S. Laker, Appellee).

*Opinion filed March 23, 1984.*

Heyl, Royster, Voelker & Allen, of Springfield (Gary L. Borah, of counsel), for appellant.

Hull, Campbell, Robinson & Gendry, of Decatur (John D. Robinson, of counsel), for appellee.

JUSTICE WARD delivered the opinion of the court:

The claimant, Larry S. Laker, filed an application for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*) to recover benefits for the loss of use of the left eye. An arbitrator awarded compensation based on 85% permanent loss of use of the eye, 15/7 weeks' temporary total disability, and $1,155.23 for medical expenses. The Industrial Commission increased the award for permanent loss to 100% and affirmed the other provisions in the arbitrator's decision. The circuit court of Christian County confirmed the Commission's finding. The claimant's employer, Certi-Serve, Inc., brought this direct appeal under our Rule 302(a). 87 Ill. 2d R. 302(a).

Laker, a pipefitter, was installing underground gasoline storage tanks at a service station in Rochester on June 1, 1979. In order to gain access to electrical wiring which his co-workers had accidentally severed, he removed an inspection plate from a neon sign. There were a number of birds' nests inside. As he was removing the nests, the wind blew one of them against his face and debris entered his eyes and his mouth.

Laker testified before the arbitrator that he was blinded for a minute or two and that his eyes began to water, became red, and itched. The next day his eyes felt better, but were still red and watering. He worked that day, but after work went to St. Vincent Memorial Hospital in Taylorville. There both eyes were flushed and a patch was placed over the right eye. The claimant returned to work on June 4, 1979.

Laker next sought medical treatment on June 7, 1979, at St. Mary's Hospital in Decatur at the suggestion of Toby Pumphrey, the owner of Certi-Serve, Inc.

The vision in Laker's left eye had become foggy. Both eyes were again bathed and an appointment was made for Laker to consult Dr. James Kammer, an opthalmologist. Dr. Kammer examined the claimant and referred him to Dr. Wyhinny of Chicago.

On June 11, 1979, a fluoroscan angiogram was taken by Dr. Wyhinny. Laker noticed a loss of vision and some redness in his left eye at this time, but little irritation. He complained of seeing a black spot in his left eye. Because of the distance between the claimant's home in Taylorville and Chicago, Laker was referred to Dr. Victor Zion in Urbana. On June 14, 1979, Dr. Zion repeated the angiogram. By June 18, 1979, Laker reported an almost "total blackout" in the left eye. Following laser treatment by Dr. Zion on that date, Laker noticed that "[t]he black spot had seemed like it was narrowing down and was just like little wrinkles out to the side of it and my vision was improving." His vision continued to improve for two or three months. In October of 1979, Laker noticed heavy black spots redeveloping in his left eye. The accident did not permanently affect the vision in the claimant's right eye.

Before the accident on June 1, 1979, Laker said he had 20/20 vision in each eye. In 1970 he had an accident in which acid was sprayed in his eyes, but it was immediately neutralized and flushed. He has never had any other problem with his eyes and has never worn glasses.

Dr. Zion, a retinal/vitreous surgeon, testified for the claimant by deposition that the results of the fluoroscan angiogram he administered showed that Laker "had two subretinal neovascular membranes near the macula of the left eye which were quite characteristic of an illness which we know as presumed ocular histoplasmosis syndrome" (POHS). POHS, which causes the growth of abnormal new blood vessels beneath the retina, is of uncertain origin. Dr. Zion stated that he could not express an

opinion with any degree of medical certainty as to whether the disease was causally related to the June 1, 1979, accident. He did state, however, that "there is some very sequential evidence that [POHS] is related to [systemic] histoplasmosis" and that bird droppings and dust are definitely related to systemic histoplasmosis. When first examined by Dr. Zion on June 14, 1979, Laker had 20/200 vision. He is legally blind in the left eye, and further treatment would not be helpful in restoring any lost vision capacity.

Dr. Edward Slifer, a pathologist at St. Vincent Memorial Hospital in Taylorville, testified by deposition for the claimant. He stated that Laker had called him in October of 1980 to inquire about presumed ocular histoplasmosis. He stated that the disease is referred to as "presumed" because there is no way short of removing the entire eye to prove that a vision impairment was caused by ocular histoplasmosis in the retina. The disease, Dr. Slifer testified, has been recognized and observed for only the last 10 years, and how it enters the system is a medically controversial subject. In response to a hypothetical question stating circumstances experienced by Laker, Dr. Slifer said:

> "[T]here is just no question in my mind that [the presumed ocular histoplasma organism] got in his eye.
>
> &ast;&ast;&ast;
>
> Those are certainly an unusual set [sic] of circumstances [so] that one scientifically would logically conclude that there is a relationship between those things."

Dr. Slifer further stated that he had grown the organism in a culture medium in three to five days, and described the human eye as an ideal culture medium. Visual disturbance would develop as soon as the organism began to grow. He testified that the most common cause of histoplasmosis is bird droppings. On cross-examination, Dr. Slifer conceded that any retinal disease could have been the cause of Lak-

er's visual problems. He described the size of the organism as one micron (0.000039 inch) or less, and capable of being absorbed in eye tissue.

Dr. Ram P. Tewari, a professor of clinical microbiology at Southern Illinois University, was referred to as a recognized expert on systemic histoplasmosis. Dr. Tewari, who testified for the respondent, stated that there is no definite association between systemic histoplasmosis and presumed ocular histoplasmosis. Birds and bird droppings, he said, do not contain the POHS organism, but droppings do serve as a nutrient. Moisture and darkness are important to the growth of the organism. He described the POHS organism as being between two and five microns in size, too large to penetrate eye tissue. In response to a hypothetical question similar to the one propounded to Dr. Slifer, Dr. Tewari gave the opinion that it was not possible for Laker to get POHS by direct exposure to the debris from the bird's nest. His opinion was based on the premises that the organism has been found only in soil, that it needs humidity, that light acts as a retardant to its growth, and that its size prevents direct penetration of eye tissue.

On cross-examination, Dr. Tewari stated that the organism can survive in soil for a year outside of its natural habitat. His cross-examination included these questions and answer:

"Q. Isn't what it boils down to, Doctor, the conclusion that we really do not know what causes ocular histoplasmosis or the phenomenon that Mr. Laker has been diagnosed to have?  There is no proof one way or the other, is there?

A. There is no direct proof that it is caused by histoplasma, that's correct.

\*\*\*

Q. \*\*\* You don't know what caused, I take it, or you don't have any theory or opinion as to what caused Mr. Laker's loss of sight, do you?

A. No."

Although requested to do so by the claimant, Dr. Tewari never examined Laker, saying that he believed it would be pointless.

We would note that, in holding for the claimant, the arbitrator observed: "[T]he only point upon which all three experts agree is that nobody really knows what causes presumed ocular histoplasmosis or whether the histoplasma organism is actually present in the condition named." Whatever the specific means under which the claimant's blindness developed, "the uncontroverted fact remains that Petitioner's symptoms commenced contemporaneously with the accident."

The Industrial Commission's decision read in part:

"Petitioner's loss of vision was caused by ocular histoplasmosis. Based on all the medical evidence in this record, there is no known cause of presumed ocular histoplasmosis. Therefore, it is possible [*sic*] to prove causal connection or no causal connection between disability from such a disease and the accident Petitioner sustained, or any other accident on a medical or scientific condition alone. Many conditions, however, can be aggravated by trauma; there is no evidence that this is not one of them. Given the course of events in this case, the Commission concludes the disability was caused by the accident."

Parenthetically, it appears that presumed ocular histoplasmosis has not been involved in any opinion of a court of review in this State. Systemic histoplasmosis has been recognized in two opinions of the appellate court as having a causal connection with the inhalation of the dust from dried bird droppings. (See *City of Des Plaines v. Gacs* (1978), 65 Ill. App. 3d 44, 49; *Mitchell v. Missouri Pacific R.R. Co.* (1968), 104 Ill. App. 2d 142, 148.) We have not found a decision in another jurisdiction where presumed ocular histoplasmosis was distinguished from systemic histoplasmosis. See, *e.g., Weisbrod v. McGauley* (Mo. App. 1981), 629 S.W.2d 413, 414 ("[h]istoplasmosis infections are

commonly carried by rats, pigeons, vermin, etc"); *State ex rel. Ohio Bell Telephone Co. v. Krise* (1975), 42 Ohio St. 2d 247, 247-48, 327 N.E.2d 756, 757 ("[d]uring his prior outdoor work [the claimant] came into frequent contact with pigeon droppings and dead pigeons, the spores from which allegedly cause histoplasmosis").

The respondent complains that the Commission, in effect, reversed the burden of proof by requiring Certi-Serve to prove the lack of causal connection between the accident and the claimant's disability. The language quoted above from the Commission's decision, it argues, indicates that the Commission was of the opinion that Laker's visual impairment was caused by an aggravation of a preexisting condition. The respondent concludes that the Commission improperly compelled Certi-Serve to prove the absence of such a preexisting condition. We do not, however, judge that the Commission's statement expressed an opinion that Laker's visual loss was caused by an aggravation of a preexisting condition. Unequivocally the Commission said that, based on all of the medical evidence in the record, the cause of presumed ocular histoplasmosis is unknown and that it was impossible to prove whether or not there was a causal connection between the accident and the claimant's disability from presumed ocular histoplasmosis. When the Commission commented that "many conditions, however, can be aggravated by trauma; there is no evidence that this is not one of them," we consider that was parenthetical and that the Commission may have been referring to Dr. Tewari's testimony that the condition of the claimant may have been caused by preexisting systemic organisms which later manifested themselves in the eye "due to some unknown reasons under adverse conditions." The remark, in any event, did not qualify or make conditional the Commission's statement that, based on all medical evidence in the record, the presumed cause of ocular histoplasmosis was unknown and that it was not possible to show here

whether there was or was not a causal connection between the accident and the disability.

Credibility of witnesses and causal connection are questions for the determination of the Industrial Commission, and the classic principle in these cases is that the Commission's decision will not be set aside on review unless it was contrary to the manifest weight of the evidence. (*United Airlines, Inc. v. Industrial Com.* (1980), 81 Ill. 2d 85; *Lambert v. Industrial Com.* (1980), 79 Ill. 2d 243.) The medical evidence here was that the etiology of presumed ocular histoplasmosis is unknown. Obviously, a claimant suffering from a condition with an unknown or scientifically uncertain causation has a handicap in attempting to prove a causal connection between an accident and his disability. Considering that this difficulty should not be insuperable, this court has held that "[a] chain of events which demonstrates a previous condition of good health, an accident, and a subsequent injury resulting in disability may be sufficient circumstantial evidence to prove a causal nexus between the accident and the employee's injury." (*International Harvester v. Industrial Com.* (1982), 93 Ill. 2d 59, 63-64, citing *Martin Young Enterprises, Inc. v. Industrial Com.* (1972), 51 Ill. 2d 149, 155.) There was here, of course, in addition to a chain of events which suggested a causal connection, the testimony of Dr. Slifer.

This court's view as to causation under circumstances similar to those described in *International Harvester v. Industrial Com.* appears to be the general holding. Professor Larson quotes approvingly from *Valente v. Bourne Mills* (1950), 77 R.I. 274, 279, 75 A.2d 191, 194:

> " 'Thus where, as in the instant case, injury appears in a bodily member reasonably soon after an accident, at the very place where the force was applied and with symptoms observable to the ordinary person, there arises, in the absence of believed testimony to the contrary, a natural inference that the injury, whatever may be the medi-

cal name, was the result of the employment.' " (3 A. Larson, Workmen's Compensation sec. 79.51(c) (1983).)

Professor Larson also observes:

"A finding that a disease is work-connected will not be reversed as being based on speculation and conjecture merely because the medical profession does not fully understand the etiology of the disease." 3 A. Larson, Workmen's Compensation sec. 80.31(c) (1983).

Understandably this court considers only legal questions which are presented; it will not presume to pass on undecided questions in other disciplines. This is illustrated in the holding of this court in *Precision Connecting Rod Service v. Industrial Com.* (1968), 40 Ill. 2d 277. There the claimant was struck in the abdominal area by a falling box. He immediately felt a sharp pain in his abdomen which intensified during the workday. A physician examined the claimant that evening, made a diagnosis of appendicitis, and later performed an appendectomy. The claimant had no history of similar distress. At the hearing on his workmen's compensation claim, the testimony of the two medical witnesses was in direct conflict on the issue of causation. This court affirmed the award for the claimant, saying:

"The concern of a court of review in Industrial Commission cases such as these is not to determine medical questions, on which, it appears, men of learning in that field disagree, but rather to pass on the legal question presented, *viz.*, are the findings of the Industrial Commission contrary to the manifest weight of the evidence presented before it." (40 Ill. 2d 277, 281.)

Too, Larson comments "that if the physical causal sequence is sufficiently impressive, the lack of precise diagnosis or etiology can be excused." 3 A. Larson, Workmen's Compensation sec. 79.51(d) (1983).

For the reasons given, we consider that the finding of the Commission was not against the manifest weight of

246

the evidence. Accordingly, the judgment of the circuit court of Christian County is affirmed.

*Judgment affirmed.*