FRANCES M. EDGCOMB, Appellant and Cross-Appellee, v. THE INDUS-
TRIAL COMMISSION *et al.* (Board of Education, District No. 150, Appel-
lee and Cross-Appellant).

Third District (Industrial Commission Division)   No. 3—88—0044WC

Opinion filed April 7, 1989.

John Lesaganich, of Goldfine & Bowles, of Peoria, for appellant.

Henry D. Noetzel, of Henry D. Noetzel & Associates, Ltd., of Peoria, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, Frances Edgcomb, filed an application for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*) for a work-related incident which occurred on March 24, 1981. Claimant alleged that, while driving a school bus in respondent's employ, she suffered neck injuries in a collision with an automobile. The arbitrator awarded claimant 37⁶/₇ weeks of temporary total disability (TTD) and found her condition had not yet reached a level of permanency. The Industrial Commission (Commission) modified the arbitrator's award of TTD to 24⁶/₇ weeks and found there was no causal relationship between the March 24, 1981, accident and claimant's cervical surgery performed on October 27, 1981. Though noting that it would not have reached the same result as the Commission, the circuit court of Peoria County confirmed the Commission's decision and denied respondent's motion to dismiss claimant's writ of *certiorari* for lack of subject matter jurisdiction. This appeal followed.

On appeal, claimant argues that the Commission's decision is against the manifest weight of the evidence. Respondent's cross-appeal argues that the circuit court of Peoria County did not acquire special statutory subject matter jurisdiction over this case. We address claimant's appeal first.

On March 24, 1981, claimant was employed by respondent as a bus driver. She was operating a bus that was struck from behind by an automobile; the impact caused claimant to be thrown between the steering gear and the door. Claimant testified that the impact was "severe." Following the accident, she was treated for neck, shoulder, and lower back pain by her family physician, Dr. Thomas Cassidy, an internist. She was hospitalized from March 27 to April 10, during which time she underwent physical therapy and received pain-killing medications. Following her release, she was maintained by Dr. Cassidy on a conservative treatment regimen, consisting of physical therapy, pain medication, muscle relaxants, and minor tranquilizers. Claimant testified that following her release from the hospital, she

continued to feel pain and stiffness in her neck and occasional numbness and shooting pain in her right arm and fingers.

While in the hospital following the accident and upon being discharged, claimant was treated by Dr. O. Sureka, a physician with the Institute of Physical Medicine and Rehabilitation. Dr. Sureka examined claimant on March 30, 1981. He observed tenderness at the back of the cervical and lumbar spine. Movement of the cervical spine was painful at terminal 10 degrees of forward flexion, extension, and lateral rotation. He noted moderate muscle spasms of paraspinal muscles in the cervical and thoraco-lumbar area. Also, he detected a slightly diminished sensation in the right thumb. On May 18, 1981, Dr. Sureka observed that movement of claimant's cervical spine was restricted beyond 30 degrees in forward flexion, extension, lateral flexion, and rotation. On June 15, 1981, Dr. Sureka noted that claimant's ability to move her cervical spine had improved but she was still experiencing pain in the back of the neck. He also noted decreased sensation in her right hand to touch and pain. On July 21, claimant was again examined by Dr. Sureka, who noted a tenderness at the base of the cervical spine. He found that movement of claimant's cervical spine was painful. The results of the July 21 electromyographic and nerve conduction tests performed by Dr. Sureka were normal.

During her treatment program with Dr. Sureka, claimant attended physical therapy on a weekly basis, wore a cervical collar, used cervical traction equipment at home, and took muscle relaxants, analgesics, and minor tranquilizers to relieve her symptoms. Claimant evidently stopped seeing Dr. Sureka in or about July. The record does not indicate the reason for this termination.

At the respondent's request, claimant was examined by Dr. Lorin Whittaker, a surgeon, on July 23, 1981. He reported that claimant experienced stiffness in the posterior neck, which caused her to proceed in a cautious manner during the exam. She could hyperextend, flex, rotate, and laterally bend her neck to essentially a normal degree, but her capacity to perform these neck movements varied from one time to another. Claimant's neck contour was normal, and no muscle spasm was noted. It was Dr. Whittaker's impression that she had sustained a flexion-extension type of injury and that she was still experiencing some symptoms of cervical strain. Nevertheless, he opined that claimant could return to work on August 15.

Claimant's treating physician, Dr. Thomas Cassidy, saw claimant on numerous occasions while she was first in the hospital following her accident and upon her discharge. His notes dated from April to

September 1981 describe claimant's ongoing cervical spine problems. On May 4, he observed that claimant had increased range of motion of the cervical spine but that she was still experiencing substantial pain with flexion, extension, and rotation. On June 1, he noted that claimant had a fair range of motion in both flexion of the neck, but less than full. On July 7, 1981, he observed that claimant was experiencing a lot of tenderness with range of motion in any direction. During office examinations on August 4 and August 25, Dr. Cassidy observed that claimant was experiencing considerable neck spasms and lack of range of neck motion.

At the request of Dr. Cassidy, claimant was examined by Dr. Jesse Weinger, an orthopedic surgeon, on September 14, 1981. Dr. Weinger found that claimant's motor strength and sensory examinations were within normal limits and that she had full range of motion of her cervical spine. Dr. Weinger noted claimant's complaints of neck stiffness and discomfort and opined that these complaints were out of proportion with objective findings. He found no evidence to suggest a cervical disc protrusion or significant ligament instability. Dr. Weinger thought that claimant could return to work and made no suggestions for further medical care. Claimant testified that this examination lasted approximately seven minutes.

Dr. Cassidy's note regarding his September 22 examination of claimant states:

> "O: Examwise she has pain when you turn her head to the right and when you extend it and flex it to the point where it stops her moving it. She has had no definitive abnormal neurologic findings or EMG findings throughout this whole thing[;] however, her physical findings are definitely abnormal with regards to ROM (range of motion).
>
> A: I think she has to remain off work until she has much freer ROM to the cervical spine and much less pain. Her job is driving a bus, and I think it is too dangerous to send her back to work.
>
> P: I will see her in about a month. Continue her other medications."

(It is apparent to us that the O, A, and P in the note above stand for observation, assessment, and prescription, respectively.)

In a letter dated September 25, Dr. Cassidy wrote to claimant's counsel that he had most recently seen claimant on September 22, at which time she was still complaining of moderately severe pain in the neck. Dr. Cassidy noted that she still had decreased range of motion to both lateral rotations of the neck and sudden pains were induced

by extreme flexion and extension of the neck. Despite Dr. Weinger's recommendation, Dr. Cassidy found it impossible to permit claimant's return to work, which involved full painless neck and shoulder rotations in order to insure the safety of her passengers.

Claimant's attorney referred her to Dr. Lawrence Holden, a neurosurgeon, for an examination. At his deposition taken on December 16, 1981, Dr. Holden stated that he had been in private practice since 1949. When he examined claimant on September 30, she complained of pain in the right side of her neck and in her right shoulder. His neurological examination revealed that there was restriction of neck motion in all directions, the cranial nerves were intact, and there was tenderness to percussion in the low cervical region and claimant's pain radiated into the ulnar aspect of the right hand. Dr. Holden admitted claimant into St. Francis Hospital on October 1 for a conservative treatment (bed rest and muscle relaxants), which failed to alter her symptoms.

On October 27, claimant underwent neck surgery, in which Dr. Holden performed a hemilaminectomy at the C7-T1 interspace. He observed a bulging in the anterior wall of the spinal canal and removed the bone and soft tissues behind the nerve. This procedure was intended to alleviate pressure on the affected nerve. Dr. Holden stated that the nerves emanating from the C7-T1 area went to the ulnar aspect of the hand. Claimant remained hospitalized until November 3.

Dr. Holden had seen claimant several times since her discharge from the hospital. He had not determined the strength in her right arm or the range of motion in her neck. He stated that claimant was not ready to return to work, as she was still recovering from surgery. He also opined that the bulge in the anterior wall of claimant's spinal column might or could have been caused by the March 24 accident.

On cross-examination, he stated that he had recorded claimant's complaints upon first seeing her on September 30 rather than neurologically examining her. Upon admittance to the hospital the following day, Dr. Holden examined claimant but did not perform grip strength, pinprick, or reflex tests. He stated that C7-T1 was a common area for a whiplash type of injury to occur. He testified that he did not perform electromyographic or nerve conduction studies or a myelogram because he found them to be inadequate tests. Dr. Holden added that he did not routinely perform these tests.

Further, on cross-examination, Dr. Holden stated that he interpreted claimant's tenderness in the low cervical region as objective.

The pain was confined to one area, which was appropriate to surgical findings. When percussion was applied to this area, it was accompanied by muscle spasms, a result which objectively supported claimant's subjective complaints. Prior to surgery, Dr. Holden noted muscle spasms in claimant's neck; these spasms accompanied her restriction of neck motion. In surgery, he found a bulge in the anterior walls of spinal canal at the C7-T1 level. Prior to claimant's discharge from the hospital following surgery, he did not perform any tests as to claimant's range of neck or arm motion. Dr. Holden opined that claimant would probably return to work within the next two months.

The Commission found that as a result of the March 24, 1981, accident, claimant was temporarily totally disabled from March 25, 1981, to September 14, 1981. The Commission based its opinion on the September 14 examination of Dr. Weinger, who opined that claimant could immediately return to work. Further, from Dr. Holden's testimony, the Commission emphasized the following facts. Dr. Holden, prior to performing surgery, did not test claimant for loss of grip strength or loss of sensation. He did not administer reflex tests and ordered no myelogram, EMG, or nerve conduction studies. The Commission also focused on the fact that no disc material was removed during the operation.

■■ ■ It is axiomatic that a reviewing court will not disturb the Commission's decision unless it is against the manifest weight of the evidence. (*Certi-Serve, Inc. v. Industrial Comm'n* (1984), 101 Ill. 2d 236.) We find that the manifest weight of the evidence supports the claimant. The only physician to *internally* examine claimant's cervical spine was Dr. Holden. During surgery, he detected bulging in the anterior wall. To correct this condition, he *removed* some of the bone, ligaments, and soft tissue at the C7-T1 interspace. The fact that Dr. Holden did not remove any *disc* material, which the Commission found so significant, does not negate the necessity of this surgery. This surgical procedure was intended to lessen or remove the pressure on the nerve which passes through this area of the cervical spine. He did not perform a myelogram or nerve conduction test because he viewed them as inadequate to determine claimant's actual condition. There is no evidence that either of these tests would have conclusively determined claimant's condition. He initially prescribed conservative therapy, which is a common measure taken to alleviate claimant's symptoms. Claimant received conservative therapy in the hospital from October 1 to October 26 because Dr. Holden believed that she could obtain a more complete bed rest there than at home.

The hospital records related to this stay are replete with many references to claimant's ongoing complaints of cervical pain radiating to her right shoulder, arm, and hand. The muscle relaxants, cervical traction, and other conservative measures had little positive impact on claimant's cervical pain and frequent pain and numbness in her right arm and hand. Dr. Holden then performed surgery on claimant's cervical spine. Almost two months after the surgery, Dr. Holden stated that claimant was not ready to return to work.

Contrary to respondent's assertions, Dr. Holden's decision to perform surgery was based in part on objective findings. Percussion applied to claimant's low cervical region produced pain which was confirmed by surgical findings. Further, the muscle spasms induced by percussion to this region served as objective evidence of claimant's complaints. Dr. Holden also observed muscle spasms in claimant's cervical spine directly prior to surgery.

His view was echoed by claimant's treating physician, Dr. Cassidy. He found that as of September 22, 1981, claimant still had decreased motion of her neck and that sudden pains were induced by extreme flexion and tension of the neck. At that time, Dr. Cassidy could not recommend claimant's return to work.

Also, during office examinations on August 4 and 25, Dr. Cassidy noted muscle spasms in claimant's lower cervical spine. This evidence further buttresses Dr. Holden's decision to operate.

In the report of Dr. Sureka's examination on July 21, which indicated normal results in electromyograph and nerve conduction tests, he states that there was a tenderness at the base of the cervical spine and that movement of the cervical spine produced pain. This tenderness and pain were consistent throughout all claimant's examinations following her March 24, 1981, accident.

The Commission's decision is based principally on Dr. Weinger's cursory examination of claimant. Claimant's unrebutted testimony is that Dr. Weinger examined her for approximately seven minutes. We note that he did not perform a myelogram, EMG, or nerve conduction study on the claimant. The Commission evidently considered Dr. Holden deficient for failing to perform these various tests, but, contradictorily, paid no attention to Dr. Weinger's failure to perform said tests. Either both are deficient for failing to perform the relevant tests or neither one is. Dr. Weinger tested claimant's sensory response, motor strength, and range of motion, all of which produced normal results. He also studied neck X rays taken on March 24 and 28, 1981. He noted no muscle spasms. Believing claimant's reports of neck stiffness and discomfort were out of proportion to his objective

findings, he recommended that claimant return immediately to work. Dr. Whittaker's examination of July 23 generally mirrors this assessment. On balance, we find the evidence obtained from Drs. Holden, Cassidy, and Sureka, gleaned from extensive examination of and contact with claimant, clearly outweighs that of Dr. Weinger.

The cases cited by respondent, *Elliott v. Industrial Comm'n* (1982), 91 Ill. 2d 100, and *Odie v. Industrial Comm'n* (1982), 88 Ill. 2d 514, are distinguishable from the instant case. In *Elliott*, the amount and weight of medical testimony proferred by the employer obviously outweighed the testimony of the one neurosurgeon who supported the claimant's contentions. Here, the weight of medical testimony, in the form of both the treating and operating physicians, favors claimant. The only evidence cited by the Commission, the records of Dr. Weinger, does not serve to overcome the evidence from claimant's medical experts. Further, in *Odie*, unlike the instant case, there was ample evidence to find that the subject surgical procedure was not causally connected to a job-related injury. The *Odie* petitioner, who had allegedly injured his lower back while working, responded well to conservative therapy and was discharged by his treating physician. In the 4½ months following this discharge, petitioner went hunting and walked a good deal. Despite a myelogram test results, and another physician's opinion to the contrary, a surgeon attempted to perform a laminectomy. During surgery, the petitioner was found not to have a herniated disc or any other related problem. The *Odie* court concluded: *"Reluctant as we are to set aside the independent judgment of the operating physician,* the facts here so clearly justify the conclusion that the lumbar fusion was not reasonably required that we cannot say the Commission erred." (Emphasis added.) 88 Ill. 2d at 520.

In the instant case, the claimant suffered ongoing symptoms of a cervical spine injury. Her treating physician never discharged her, and she did not respond well to conservative therapy. Most importantly, the operating physician found objective evidence of pressure on a nerve root and, consequently, performed a hemilaminectomy in which he removed fragments of bone and soft tissues. Moreover, *Odie*, which indicates that reviewing courts should only reluctantly set aside the operating physician's assessment, serves to support our decision that the Commission's decision is against the manifest weight of the evidence.

Next, respondent argues that claimant failed to comply with the requirements of section 19(f)(1) of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 138.19(f)(1)). Specifically, re-

spondent argues that claimant failed to commence the proceeding for review within 20 days of the receipt of the notice of the decision of the Commission, and as a result, the circuit court did not acquire special statutory subject matter jurisdiction to review this case.

■ The presumption of subject matter jurisdiction does not exist in cases under the Act, because the court is exercising a special statutory jurisdiction and compliance with the statute must appear on the record. *Bemis Co. v. Industrial Comm'n* (1983), 97 Ill. 2d 237.

■ The affidavit filed by claimant's counsel, John Lesaganich, states that the Commission's notice of decision was received by this office on June 12, 1984. Thus, the last day to file for judicial review was July 2, 1984. Lesaganich then stated that on June 29, 1984, claimant's counsel filed with the circuit court of Peoria County a *praecipe* for writ of *certiorari*, a writ of *scire facias*, and certificate of mailing writs of *scire facias* and *certiorari* (hereinafter documents). The attorneys of record for respondent were mistakenly listed as Heyl, Royster, Voelker & Allen and not Henry D. Noetzel and Associates. The affidavit further avers that a secretary from Lesaganich's firm retrieved the original copy of the above documents filed with the circuit court and corrected the attorneys of record to properly reflect respondent's attorney.

The reverse sides of the documents reveal that they were originally filed with the court at 4:24 p.m. on June 29, 1984. Although the filing stamp on the front of each of them, without explanation, has been "whited out," none of the documents presently exhibits a filing stamp on its face. The writ of *scire facias* and writ of *certiorari* each bears the date of July 3, 1984, with the word "June" crossed out and July inserted.

Respondent argues that the evidence clearly demonstrates that the disputed documents were filed on July 3, 1984, and, therefore, claimant did not file within the 20-day statutory period. Given this record, we do not share respondent's certitude that claimant did not meet the statutory requirements.

On one hand, Lesaganich's affidavit said that the documents were filed on June 29, as indicated on the reverse side of the documents. On the other hand, the documents bear the date of July 3, 1984. There is no filing stamp on the documents or other evidence to clearly determine this issue. To invoke the strict and literal intent of the statute and thereby void claimant's appeal, we need clear evidence of failure to meet the statute's 20-day requirement. Such evidence is not in this record. Accordingly, we find that the circuit court of Peoria County correctly denied respondent's motion to dismiss the

writ of *certiorari* for lack of subject matter jurisdiction.

In conclusion, we reverse the judgment of the circuit court confirming the Commission's decision and remand this case for further proceedings consistent with this opinion.

Reversed and remanded.

BARRY, P.J., and McNAMARA and LEWIS, JJ., concur.

JUSTICE McCULLOUGH, concurring in part and dissenting in part:

The Industrial Commission found that on September 14, 1981, the petitioner was examined by Dr. Weinger, an orthopedic surgeon. Dr. Weinger found that there was no evidence to suggest a cervical disc protrusion or significant ligament instability. It was Dr. Weinger's opinion that the petitioner could go back to work on a regular duty status. With respect to Dr. Holden's examination and surgery, the Industrial Commission found that he performed a laminectomy at the C7-T1 and that prior to performing the surgery he did not test the petitioner for loss of grip strength or loss of sensation, did not administer reflex tests, ordered no myelogram, EMG or nerve conduction studies and that pursuant to the surgery no disc material was removed.

The Commission's finding that there was no causal relationship between the March 24, 1981, accident and the claimant's cervical surgery performed on October 27, 1981, is not against the manifest weight of the evidence. Keeping in mind that Dr. Weinger examined the petitioner at the request of Dr. Cassidy, who was also petitioner's doctor, Dr. Weinger's notes showed that the motor strength and sensory examination were within normal limits, that the claimant had a full range of motion of the cervical spine, and that the complaints of neck stiffness and discomfort were out of proportion with the objective findings. Dr. Weinger found no evidence at all to suggest a cervical disc protrusion or significant ligament instability. Specifically, the doctor stated in his report to Dr. Cassidy:

> "It's my feeling that this patient's complaints of neck stiffness and discomfort are somewhat out of proportion to objective findings. The accident occurred 3-24-81 and she's had sufficient time and conservative management for a simple sprain to heal and there is simply no evidence at all to suggest a cervical disc protrusion or significant ligament instability, etc. I feel this patient could go back to work on a regular duty sta-

tus. I don't think further diagnostic testing is warranted."

The petitioner, also of her own volition, went to the Institute of Physical Medicine and Rehabilitation and was examined by Dr. Sureka. Dr. Sureka found that "movement of both shoulder joints was normal. Muscle strength was normal in both upper extremities. There was no sensory deficit to touch, pain, position and vibration sense in both upper extremities except a slight diminished sensation in the right thumb. Position and vibration sense were normal in both upper extremities. Deep tendon reflexes were also normal in both upper extremities." Dr. Sureka recommended a program of physical therapy consisting of "hot packs for the back of the neck, upper and lower back, light sedative massage, Williams flexion exercises for the low back and mobilizing exercises for cervical spine, intermittent cervical traction will be carried out." The petitioner did not return to Dr. Sureka but instead went to Dr. Lawrence Holden on referral by her attorney. Dr. Whittaker examined the petitioner at the request of the respondent and found that she could return to work August 15 or the start of school. He found "examination of both arms reveals a full range of motion including full abduction and internal and external rotation. There is no atrophy. There seems to be no sensation disturbance. She has a normal grip. Examination of her back reveals a normal thoracic spine in a normal position without spasm. The lumbar back examination is normal. She can flex her back to a normal degree and return it promptly to an upright position. Her range of motion otherwise is normal and there is no muscle spasm or tenderness present." He also stated that the X-ray examination and lateral views of the cervical spine were essentially normal.

As stated, this court should not disturb the Commission's decision unless it is against the manifest weight of the evidence. We should not put ourselves in a position of determining the credibility of the witnesses or the weight to be given to that evidence. The testimony of Drs. Weinger and Whittaker is more than sufficient to justify the finding and order of the Industrial Commission.

With respect to the motion to dismiss, under section 19(f)(1) (Ill. Rev. Stat. 1983, ch. 48, par. 138.19(f)(1)), the proceeding for review is to be commenced within 20 days of receipt of notice of the decision of the Commission. The summons shall be issued by the clerk upon written request. The petitioner filed the proceeding for review on June 29, 1984, at 4:24 p.m. As stated in the affidavit of the employee's counsel, it indicates that the secretary for the law firm went to the clerk's office and persuaded a clerk to white out the file mark so that she could return the documents to the law office to correct

the name of the appropriate attorney for the respondent. This the clerk should not have done. Respondent, however, does not file any affidavits from the clerks as to what transpired, and even though the affidavit of attorney for petitioner does not indicate when the request for summons was refiled, there is in the record a file mark showing "June 29, 4:24 p.m. '84" with a record number of 84—MR—2876. In the record, this appears on the affidavit of petitioner's attorney that a check was mailed to the Illinois Industrial Commission. In the absence of any affidavits or other records before this court to determine when the petition for review was filed, this document indicates a case number and a file mark within the 20-day period. As the majority points out, the respondent's motion to dismiss based upon the failure to timely file a petition for review should be denied.