# Illinois Official Reports

## Appellate Court

***ABF Freight System v. Illinois Workers' Compensation Comm'n*,
2015 IL App (1st) 141306WC**

| | |
|---|---|
| Appellate Court Caption | ABF FREIGHT SYSTEM, Respondent-Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (John Rodriguez, Petitioner-Appellee). |
| District & No. | First District, Workers' Compensation Commission Division Docket No. 1-14-1306WC |
| Filed | December 11, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-50911; the Hon. Robert Lopez-Cepero, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Matthew Ignoffo, of Keefe, Campbell, Biery & Associates, LLC, of Chicago, for appellant. |
| | Ivan M. Rittenberg, of Rittenberg, Buffen, Gulbrandsen, Robinson & Saks, Ltd., of Chicago, for appellee. |
| Panel | JUSTICE HUDSON delivered the judgment of the court, with opinion. Presiding Justice Holdridge and Justices Hoffman, Harris, and Stewart concurred in the judgment and opinion. |

**OPINION**

## I. INTRODUCTION

Respondent, ABF Freight System, appeals an order of the circuit court of Cook County that confirmed a decision of the Illinois Workers' Compensation Commission (Commission) granting benefits to claimant, John Rodriguez, in accordance with the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq*. (West 2010)). Respondent raises a number of arguments as to why the Commission's decision should not stand. As we find none of these arguments well founded, we affirm.

## II. BACKGROUND

It is undisputed that claimant suffered a compensable injury on August 22, 2011, when he backed a forklift into a raised steel structure on a loading dock while in respondent's employ. Claimant described the collision as "violent." He felt pain shoot down his left leg. His primary care physician, Dr. Leo Pepa, referred him to Dr. Tom D. Stanley, a board certified orthopedic surgeon. Stanley first examined claimant on August 24, 2011. He ordered a magnetic resonance imaging (MRI) scan, which revealed that a "large left para-central disc extrusion at the L5-S1 level with superior migration, [*sic*] is compressing the same sided S1 traversing nerve root and the thecal sac" and showed "[d]iffuse disc bulges at the L1-L2 and L2-L3" levels. Claimant also complained of pain in his right knee. On October 6, 2011, Stanley performed a hemilaminotomy discectomy. This surgery was paid for by respondent's workers' compensation carrier. During an October 21, 2011, follow-up visit, claimant reported that he was doing well and his pain had largely resolved. He was released to light-duty work.

One month later, during another follow-up visit, claimant reported that he had begun experiencing radicular symptoms in his left leg. Stanley diagnosed a recurrent disc herniation and possibly a meniscus tear in the right knee. In December 2011, Stanley ordered another MRI. A number of medical professionals disagreed on what this MRI showed. Stanley interpreted it as revealing a recurrent disc herniation at the L5-S1 level. A radiologist interpreted the MRI as representing "postsurgical changes." He noted, "There is intermediate T1 signal material extending posteriorly from the disc space in a left paracentral location approximately 7 mm." He continued, "This enhances on postcontrast axial images and is therefore compatible with epidural fibrosis rather than disc protrusion." The material "displaces the origin of the left S1 nerve root posteriorly."

On January 30, 2012, claimant was examined by Dr. Andrew Zelby on respondent's behalf. He believed the MRI simply showed postoperative changes. He opined that repeating the discectomy surgery was not warranted, as the MRI indicated no disc protrusion. Further, claimant was not a candidate for a fusion due to his degenerative disc disease, smoking, and obesity. Zelby believed a fusion would create more problems than it solved. Zelby noted certain inconsistencies during his examination of claimant. For example, the results of the lying straight-leg raise and the sitting straight-leg raise were different despite the fact that they are essentially the same test. Zelby recommended a work-hardening program.

Stanley reviewed and responded to Zelby's findings. In a letter, Stanley wrote, "I do not really understand [Zelby's] evaluation of the MRI because clearly on the MRI you can see

the current disc herniation." Stanley suggested that if there was any doubt as to the December 2011 MRI, a repeat MRI be performed with a "high-definition machine." A repeat MRI was performed on May 25, 2012. It showed a large disc herniation.

¶ 8    However, between the times of the two MRIs, claimant suffered an injury. On March 20, 2012, his newborn baby was crying. He went to change her and noted there were no diapers, so he went to the garage, where more diapers were stored. Claimant described the incident thusly: "And I went to step on a chair and noticed the chair was kind of flimsy; and when I came down–there was a jagged edge on the chair. When I came down, I cut my leg open." Claimant suffered a 12-inch laceration on his leg and sought medical care at the St. Alexius Medical Center. Claimant stated that if he had injured his back at this time, he would have reported the injury to his doctors. He further testified that he did not fall off the chair. Medical records from this visit corroborate claimant's testimony. His back pain did not change following this incident.

¶ 9    Subsequently, Zelby opined that this incident could have been an intervening cause. Specifically, he stated, "I would say that if he fell off a chair with such force to lacerate his leg, that could certainly be enough force to cause a recurrent herniation, particularly in someone who weighs 388 pounds." He based this opinion on his belief that the December 2011 MRI showed no recurrent disc herniation while the May 2012 MRI did.

¶ 10   Stanley again responded to Zelby's updated opinion. He wrote, "Again, I don't understand Dr. Zelby's interpretation because the recurrent disc herniation is clearly visible on the first MRIs." He further noted that to the extent Zelby based his opinion on claimant having fallen from a chair, the medical records at St. Alexius Hospital "show that he was not complaining of any other complaints other than the laceration."

¶ 11   The arbitrator found that claimant's condition of ill-being was causally related to his employment with respondent. She first noted that there was no dispute as to accident, causation as to the initial injury, and the appropriateness of claimant's initial surgery. At issue was whether claimant's continuing condition of ill-being (the recurrent disc herniation) was causally related to claimant's at-work accident and whether claimant should receive surgery for that condition. Also at issue was the causal relationship between the condition of claimant's knee and his employment. She expressly found Stanley's testimony to be entitled to greater weight than Zelby's. She characterized claimant's ongoing complaints as "credible." The arbitrator found Stanley's readings of the MRIs to be entitled to greater weight as well. Thus, to the extent Zelby's opinion is based on his belief that the December 2011 MRI did not show a herniation, it was ill founded. She also found that the condition of claimant's right knee was causally related to his employment, relying primarily on the fact that his knee problem developed concurrently with his work-related accident. Claimant's average weekly wage was determined to be $674.46, resulting in a temporary-total-disability (TTD) rate of $449.64 (a finding later modified by the Commission, as will be explained below). The arbitrator also overruled an objection by claimant to certain testimony from Zelby asserting that it was not based on medical records or contained in his report (the Commission overruled that arbitrator's ruling here).

¶ 12   The Commission affirmed and adopted most of the arbitrator's opinion; however, it modified two aspects of it. The Commission noted that claimant's testimony was unrebutted. Furthermore, medical records corroborate that he experienced only a short period of relief following the initial surgery. Prior to the December 2011 MRI, his symptoms gradually

- 3 -

worsened. It found that, regarding the March 2012 incident involving the leg laceration, the evidence and testimony contained "no indication of any type of fall or twisting to reinjure his back." It credited Stanley's testimony that radicular symptoms were already present in December 2011. It rejected Zelby's opinion for a number of reasons, including that it failed "to take into account the undisputed medical documentation of the return of [claimant's] radicular symptoms about three weeks post surgery."

¶ 13        Regarding average weekly wage, the Commission modified the arbitrator's decision, finding as follows. When claimant began working for respondent, he was employed as a "casual employee." He held this position from December 11, 2010, to March 19, 2011. As a casual employee, claimant was told the day before a shift whether respondent needed him to come to work. He was nonunion and worked about 19 hours per week. After obtaining his certification as a "spotter," claimant became a full-time, union employee and worked about 36.6 hours per week. Essentially, the Commission determined that time spent as a casual employee should not have been used to calculate claimant's average weekly wage. However, it also held that the arbitrator erroneously concluded that claimant had worked $21^3/_7$ weeks in his new position rather than 22 weeks. The Commission, using 22 weeks, recalculated claimant's average weekly wage as $661.29, which yielded a TTD rate of $440.86. It modified the arbitrator's decision accordingly.

¶ 14        The Commission also reversed the arbitrator's overruling of claimant's objection to the admission of the deposition of Zelby. The Commission determined that "Zelby's opinions contained within the deposition transcript were not based on medical records and not contained in his § 12, [Independent Medical Evaluation (IME) report]." It thus concluded that "[t]he Arbitrator erred in allowing the deposition transcript into evidence." It further held that this issue was moot, as the arbitrator found Stanley's testimony to be entitled to more weight.

¶ 15        Respondent appealed. The circuit court of Cook County confirmed the Commission without significant comment. This appeal followed.

¶ 16                                III. ANALYSIS

¶ 17        On appeal, respondent raises three main issues. First, it asserts that the Commission's decision regarding causation is contrary to the manifest weight of the evidence (it also attacks a number of the Commission's rulings that are derivative of this argument). Second, it contends the Commission erred in calculating claimant's average weekly wage. Third, it contests one of the Commission's evidentiary rulings.

¶ 18                                A. CAUSATION

¶ 19        Respondent first attacks the Commission's decision regarding causation. Causation presents a question of fact. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984). Accordingly, we will disturb the decision of the Commission on this issue only if it is against the manifest weight of the evidence. *Id*. A decision is contrary to the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291 (1992). A claimant bears the burden of establishing a causal connection between his or her condition of ill-being and employment. *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 63 (1989). As the trier of fact, the Commission is primarily responsible for resolving conflicts in the evidence, assessing the

credibility of witnesses, assigning weight to evidence, and drawing reasonable inferences from the record. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). This is especially true regarding medical matters, where we owe great deference to the Commission due to its long-recognized expertise with such issues. See *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979). On appeal, it is respondent's burden, as the appellant, to convince us that the Commission erred. See *TSP-Hope, Inc. v. Home Innovators of Illinois, LLC*, 382 Ill. App. 3d 1171, 1173 (2008). It is not our role to reweigh evidence and substitute our judgment for that of the Commission. *Setzekorn v. Industrial Comm'n*, 353 Ill. App. 3d 1049, 1055 (2004).

¶ 20 Unfortunately, respondent's argument concerning causation is really an invitation for us to do just that. Respondent begins its argument by attacking claimant's credibility. Respondent asserts that claimant only once presented to a doctor for back problems, yet records from Stanley indicate a long history of back problems. Thus, respondent asserts, claimant's testimony is inconsistent with Stanley's records. However, on their face, these propositions are not inconsistent. If claimant had a long, albeit minor, history of back problems that never warranted treatment, only seeking medical care once would not be surprising. Essentially, respondent asks that we speculate here as to the severity of claimant's prior condition, determine claimant's history was such that one visit is incredible, and draw an adverse inference about claimant's credibility. More fundamentally, credibility is primarily for the Commission. See *Hosteny*, 397 Ill. App. 3d at 674. Furthermore, we note that respondent's argument ignores significant evidence that bolsters claimant's credibility. For example, as the Commission observed, "The medical records in evidence support [claimant's] testimony" regarding the recurrence of radicular symptoms after his surgery. Moreover, the evidence concerning his treatment for the laceration of his leg indicated that–as he testified–he did not fall. Thus, even if the purported discrepancy identified by respondent existed, countervailing evidence would leave us unable to say that the Commission's decision is contrary to the manifest weight of the evidence.

¶ 21 Respondent next points to the disagreement between the doctors regarding the interpretation of the December 2011 MRI. Respondent first asserts that Stanley "is not a board certified neurologist." We find this statement somewhat disingenuous, in that respondent does not acknowledge that Stanley is, in fact, a board certified orthopedic surgeon until later in its brief. It points out that Zelby is a board certified neurologist. However, respondent never identifies anything that would allow us to conclude that a board certified neurologist is more qualified to interpret an MRI than a board certified orthopedic surgeon. As such, these assertions do nothing to establish that an opposite conclusion to the Commission's is clearly apparent.

¶ 22 Respondent also points out that the radiologist, like Zelby, also did not read the MRI as indicating a herniation. Thus, respondent contends, "This is not merely the situation of a treating doctor versus an IME doctor." However, it is well-established that the manifest weight of the evidence is not measured simply by counting noses. *Haas v. Woodard*, 61 Ill. App. 2d 378, 384-85 (1965) ("In determining the question of manifest weight, it is clear that the number of witnesses may be a factor, but it is not the controlling consideration ***."); see also *Augustine v. Stotts*, 40 Ill. App. 2d 428, 433 (1963) ("The number of witnesses testifying to a particular set of facts is not significant ***."). Thus, the mere fact that two doctors

interpreted the MRI as not showing a herniation while one did is not, in itself, enough for us to say that an opposite conclusion to the Commission's is clearly apparent.

¶ 23     Respondent next argues that Stanley's comments noting the lack of complaints about claimant's back during claimant's visit to the St. Alexius Medical Center for treatment for his laceration is not dispositive of the issue of whether claimant sustained a back injury on that date. We agree; however, we note that, while not dispositive, it, along with medical records from that visit and claimant's testimony, supports an inference that claimant did not injure his back at that time. Respondent continues, "[I]t stands to reason the only complaint which would be identified on this date would be related to the extensive laceration as this would be the emergency treatment being provided on this date." We do not disagree with respondent, but we point out that this is not the only inference possible. In essence, respondent would like us to draw the inference it suggests and substitute our judgment for the Commission, which drew the contrary inference that the absence of a complaint indicated that no back injury occurred during this incident. This we simply cannot do. See *Setzekorn*, 353 Ill. App. 3d at 1055.

¶ 24     Respondent points out that claimant had a long-standing history of back problems. However, it is well established that an employer takes an employee as he or she finds him. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 204-05 (2003). Thus, the existence of a pre-existing condition does not preclude recovery under the Act. Respondent's observation is, therefore, irrelevant. Moreover, respondent acknowledges that claimant's initial injury and treatment were related to his employment.

¶ 25     In short, we find none of respondent's attacks upon the Commission's decision on causation persuasive; therefore, we affirm it. As we uphold this finding by the Commission, respondent's attacks upon the Commission's awards of prospective medical treatment and TTD necessarily fail, as they are wholly derivative of respondent's first argument.

¶ 26                                    B. AVERAGE WEEKLY WAGE

¶ 27     Respondent next contends the Commission erred in calculating claimant's average weekly wage. Claimant worked as a "casual employee" for respondent from December 11, 2010, to March 19, 2011. He subsequently obtained a certification as a "spotter." After becoming a spotter, claimant was employed as a full-time employee for 22 weeks prior to his accident. Claimant earned more as a spotter than he did as a casual employee. The Commission only counted claimant's time as a spotter in calculating claimant's average weekly wage. Respondent contends it should have used both periods during which claimant worked for respondent, which would result in a lower average weekly wage. Section 10 of the Act provides, in pertinent part, as follows:

          "The compensation shall be computed on the basis of the 'Average weekly wage' which shall mean the actual earnings of the employee *in the employment in which he was working at the time of the injury* during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52 ***." (Emphasis added.) 820 ILCS 305/10 (West 2010).

At oral argument, a question arose as to the meaning of the phrase "in the employment in which he was working at the time of the injury." *Id.* On the one hand, it was posited that "employment" (which is not defined in the Act) referred to the occupation in which the

employee was working at the time of the injury, *i.e.*, as a spotter. On the other, it was suggested the "employment" meant the period during which the employee worked for the employer, which would encompass both the period claimant worked as a spotter and the period he was a casual employee.

¶ 28    Generally, where the language of a statute is clear, we must give effect to its plain language. *General Motors Corp. v. Pappas*, 242 Ill. 2d 163, 180 (2011). In *People v. Nash*, 409 Ill. App. 3d 342, 349 (2011), the court explained that when the legislature does not define a term in a statute, we may consult a dictionary to ascertain its meaning. Hence, we turn first to the dictionary to ascertain whether the language of section 10 is clear and unequivocal on this point. Webster's Third New International Dictionary contains several definitions for the term "employment." Pertinent here, it defines "employment" as "work (*as customary trade, craft, service, or vocation*) in which one's labor or services are paid for by an employer." (Emphasis added.) Webster's Third New International Dictionary 743 (2002). This definition, particularly the italicized portion, supports interpreting the term as referring to the particular job in which claimant was engaged at the time of the injury. However, the dictionary also defines "employment" as "the act of employing someone or something or the *state of being employed*." (Emphasis added.) *Id.* This definition suggest that the entire time that claimant was employed by respondent (as he was in "the state of being employed") should be considered under the statute. Thus, we are confronted with an ambiguity, so we turn to ordinary principles of statutory construction to resolve it. *Norris v. Industrial Comm'n*, 313 Ill. App. 3d 993, 996 (2000). Our primary goal remains to ascertain and give effect to the intent of the legislature. *Patton v. Industrial Comm'n*, 147 Ill. App. 3d 738, 741 (1986).

¶ 29    Of course, "if the meaning of an enactment is unclear from the statutory language itself, the court may look beyond the language employed and consider the purpose behind the law and the evils the law was designed to remedy." *Gruszeczka v. Illinois Workers' Compensation Comm'n*, 2013 IL 114212, ¶ 12. We may further consider "the consequences that would result from construing the law one way or the other." *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 604 (2008). It has repeatedly been held that "the Act is a remedial statute and should be liberally construed to effectuate its main purpose." *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 149 (2010); see also *Pathfinder Co. v. Industrial Comm'n*, 62 Ill. 2d 556, 563 (1976). The main purpose of the Act is to "provide financial protection for injured workers." *Interstate Scaffolding, Inc.*, 236 Ill. 2d at 149.

¶ 30    The present case illustrates why the legislature intended "employment" to mean the particular job a claimant was engaged in at the time of an injury rather than the continuous period of employment with a single employer. At the time of his accident, claimant was earning wages as a spotter–that is what he lost as a result of the accident. Having secured his union position, there is no indication that claimant would ever return to casual employment in the future. As such, the true measure of claimant's loss is the wages he was earning at the time he was injured, and that is what his award should be based on. This is consistent with the remedial purposes of the Act. *Hasler v. Industrial Comm'n*, 97 Ill. 2d 46, 52 (1983) (holding that the purpose of the Act is to make an injured employee whole).

¶ 31    Indeed, the contrary interpretation would run afoul of the absurd-results rule, which states that we must presume the legislature did not intend an absurd or unjust result when it enacted

a statute. *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262, 283 (2010). Quite simply, at issue is claimant's loss of future earnings. Our supreme court explained in *Flynn v. Industrial Comm'n*, 211 Ill. 2d 546, 561 (2004), "The aim of the system of workers' compensation is to make an employee whole for the interference with his future earnings occasioned by an injury." Essentially, respondent's proposed method of calculating claimant's average weekly wage imputes an intent to the legislature to measure the degree of claimant's compensation by something he did not lose (*i.e.*, a casual employee's wages). Claimant is now a spotter; he is no longer a casual employee. There is no relationship between what claimant earned as a casual employee and what he lost when he could no longer work as a spotter. What he earned in a position he no longer holds provides no insight into his future earnings. Thus, the proper measure of claimant's damages is the pay he received as a spotter. If we were to presume that the legislature intended to measure claimant's loss by something to which it bears no relationship, we would be attributing to it an absurd and unjust intent. This is something we will never do. See *Hubble*, 238 Ill. 2d at 283.

¶ 32    Accordingly, we find respondent's position untenable for two reasons: it is contrary to the purpose of the Act, and it would require us to impute an absurd, unjust intent to the legislature. Therefore, we hold that "employment" as used in the context discussed above means the position in which a claimant was working at the time of his or her injury. In this case, at the time of his injury, claimant was working as a "spotter" and earning a salary based on that position. Thus, the Commission properly used claimant's employment at the time of his injury in calculating his average weekly wage.

¶ 33                                 C. EVIDENTIARY RULING

¶ 34    The Commission excluded the deposition of Zelby from evidence because, it explained, "Zelby's opinions contained within the deposition transcript were not based on medical records and not contained in his § 12, IME report." It continued, claimant "was apparently not provided with proper notice of that testimony." It also noted that the issue was moot since "the [a]rbitrator placed more reliance and credibility in the opinions of Dr. Stanley and found for [claimant] on the [relevant] issues above." Such evidentiary issues are matters within the discretion of the Commission. *Greaney v. Industrial Comm'n*, 358 Ill. App. 3d 1002, 1010 (2005).

¶ 35    Initially, we note that respondent has forfeited this issue. In contravention of Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013), respondent provides no legal authority to support its argument on this point. As such, it is forfeited. See *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23. Moreover, the Commission, like the arbitrator, rejected Zelby's opinion in favor of Stanley's, stating "Dr. Zelby's opinions appear less credible than Dr. Stanley who had been seeing [claimant] over a long period of time." Therefore, even if the Commission had not struck Zelby's deposition testimony, a different result would not have followed. In other words, in addition to being forfeited, this issue is moot. See *Hanna v. City of Chicago*, 382 Ill. App. 3d 672, 677 (2008) ("Mootness occurs once the plaintiff has secured what he basically sought and a resolution of the issues could not have any practical effect on the existing controversy."). Accordingly, this argument provides no basis for us to disturb the Commission's decision.

## IV. CONCLUSION

In light of the foregoing, the decision of the circuit court of Cook County confirming the decision of the Commission is affirmed.

Affirmed.