2018 IL App (1st) 182709WC-U

Workers' Compensation
Commission Division
Order Filed: December 27, 2019

No. 1-18-2709WC

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| LUIS VILLEGAS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 2016-L-50408 |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION and KELLEY'S TRUCK CENTER, | ) | |
| | ) | |
| Appellees, | ) | |
| | ) | Honorable |
| (The Illinois State Treasurer, as *ex-officio* Custodian of | ) | Michael F. Otto, |
| the Injured Workers' Benefit Fund, Appellee). | ) | Judge, Presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson and Cavanagh concurred in the judgment.

ORDER

¶ 1    *Held:* The Commission's decision denying the claimant benefits after September 15, 2011, and awarding PPD benefits, rather than odd-lot PTD benefits, was not against the manifest weight of the evidence.

1

¶ 2      The claimant, Luis Villegas, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)), seeking benefits for an injury to his right arm that he allegedly sustained on February 23, 2011, while working as a mechanic for Kelley's Truck Center (KTC). Because KTC did not have workers' compensation insurance, the claimant also named the Illinois State Treasurer (Treasurer), as *ex-officio* custodian of the Injured Workers' Benefit Fund, as a respondent.

¶ 3      On December 9, 2014, following a hearing, the arbitrator issued a decision, finding that the claimant's "right biceps tendon rupture" arose out of and in the course of his employment and was causally related to his February 23, 2011, work accident, but that the "chronic osteomyelitis" in his right shoulder was not causally related to his work accident. The arbitrator awarded the claimant 29-1/7 weeks of temporary total disability (TTD) benefits for the period from February 24, 2011, through September 15, 2011 (the date he was released to unrestricted work and found to be at maximum medical improvement (MMI)), and "50.6" weeks of permanent partial disability (PPD) benefits for a 20% loss of use of his right arm. In doing so, the arbitrator denied the claimant odd-lot permanent total disability benefits (PTD). The arbitrator further ordered KTC to pay the reasonable and necessary medical expenses incurred by the claimant through September 15, 2011.

¶ 4      The claimant filed a petition for review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission). On May 17, 2016, the Commission issued a unanimous decision affirming and adopting the arbitrator's finding.

2

¶ 5    On June 27, 2016, the claimant sought judicial review of the Commission's decision in the circuit court of Cook County. On June 7, 2017, the circuit court entered an order confirming the Commission's decision.

¶ 6    The claimant appealed and this court remanded the cause for a determination of whether the claimant complied with the statutory requirements to perfect review; namely, sections 19(b) and 19(f)(1) of the Act. 820 ILCS 305/19(b), 19(f)(1) (West 2010)). On remand, the circuit court concluded that the claimant established that he filed his appeal within the requisite 20-day time period, which effectively conferred the court with subject matter jurisdiction. On December 13, 2018, pursuant to our mandate, the court reinstated its June 7, 2017, order confirming the Commission's decision and this appeal followed.

¶ 7                                I. Background

¶ 8    The following background facts were taken from the arbitration hearing held on November 17, 2014. While KTC did not attend the hearing despite receiving proper notice, both the claimant and Treasurer attended the hearing and presented evidence. The evidence adduced at the hearing included the claimant's testimony, depositional testimony, the claimant's medical records, job search documentation and a report from Susan Entenberg, a certified rehabilitation counselor.

¶ 9    The claimant testified to the following. On February 23, 2011, approximately three months after he began working for KTC as a diesel mechanic, he sustained an injury to his arm while emptying a garbage can into a dumpster at his supervisor's request. The claimant specifically recalled hearing two pops and a snap when he raised the can and began tipping it into the dumpster. He dropped the can and felt immediate pain in the lower part of his

3

right arm that extended upward into his shoulder. No other employees witnessed the incident, but the claimant reported his injury to his supervisor within five minutes and requested transportation to the hospital. However, the supervisor refused and told the claimant, who was without a car, to wait until the owner of the business returned. The claimant then called his son, who left work and drove to KTC. After driving his son back to work, the claimant drove his son's car to Elmhurst Memorial Hospital emergency room.

¶ 10    The medical documentation from the emergency room visit reflects that the claimant was provisionally diagnosed with "bicep muscle strain." X-rays of his elbow and arm showed no fracture, dislocation, or visible soft tissue swelling but did reveal some ossification extending into the soft tissues in his upper arm, which was "probably related" to a previous surgery and some "associated myositis." The claimant reported pops and upward muscle movement in his right arm while lifting a garbage can at work. The treating physician suspected the claimant's bicep tendon had snapped and directed him to "follow up" with an occupational health services provider. The claimant was released without written restrictions but was advised to avoid lifting more than 10 pounds, making repetitive movements or reaching above his shoulder.

¶ 11    On March 1, 2011, the claimant presented to Dr. David Vitale, an occupational health physician at Elmhurst Memorial Occupational Health Services. Dr. Vitale noted the claimant had pain and tenderness in his bicep area with bruising on his lower arm but no injury to his shoulder or wrist. Dr. Vitale found the claimant would "likely be unable to carry out any modified duty" at that time and recommended that the claimant be taken off duty if no light duty work were available. Dr. Vitale also recommended that the claimant

4

avoid using his right arm and hand for lifting, pushing or pulling.  Dr. Vitale believed an MRI would "likely be necessary" and referred the claimant to Dr. Kevin Tu, a specialist in orthopedics and sports medicine, for further evaluation and treatment.

¶ 12    Dr. Tu first examined the claimant in early March 2011, and the claimant underwent an MRI shortly thereafter. The MRI revealed a complete tear in the tendon of the claimant's right distal bicep. On March 18, 2011, Dr. Tu performed surgery to reattach the tendon, which was successful with no complications noted.

¶ 13    The claimant testified that he wore a sling for approximately five or six months following the surgery. The medical records show that the claimant remained off work April 25, 2011, when Dr. Tu authorized him to return to work with a restriction that he not use his right arm.

¶ 14    The claimant was scheduled for physical therapy and warned that permanent disability could result if the therapy were "delayed." Despite Dr. Tu's warning, some of therapy sessions were canceled because KTC had not made payments. The claimant was also given exercises that he could perform at home.

¶ 15    The claimant applied for Social Security disability benefits between June and August 2011, but his application was denied. Dr. Tu responded to an inquiry from the Illinois Department of Human Services regarding the claimant's application for benefits with a statement that the claimant was "to be off work for 6 months from the date of his surgery."

¶ 16    The claimant testified that his condition improved over time, but he continued to feel pain and weakness throughout his arm and shoulder, especially when twisting his arm.

5

He complained to Dr. Tu about shoulder pain and other discomfort in his arm after he stopped wearing the sling.

¶ 17   On September 15, 2011, the claimant presented to Dr. Tu for a follow up examination. The claimant testified that, despite reporting ongoing pain in his shoulder at this appointment, he was advised that Dr. Tu could no longer keep him as a patient "due to [the] surgery" on his bicep because it had been "over seven months," the claimant reported no pain in his tendon and "the injury that [Dr. Tu] fixed was only due to that time, a seven-month period." Dr. Tu refused to order an MRI of the claimant's shoulder because he did not think the bill would be paid by KTC. Dr. Tu, finding that the claimant was at maximum medical improvement (MMI), released the claimant to work without restrictions, noting that the claimant had completed a course of physical therapy, had "no deficits," and could continue his therapy as a home exercise program.

¶ 18   The claimant testified that he did not return to work in September 2011 because he disagreed with Dr. Tu's work release without restrictions and "felt like there was something wrong still with [his] arm." Instead, he went to see Dr. Padamjit Singh, an internist, on December 12, 2011. The claimant complained of pain and requested an MRI of the shoulder, which Dr. Singh ordered. Dr. Singh also prescribed pain medication, and thereafter became the claimant's primary care doctor.

¶ 19   Between December 2011 and February 2012, the claimant underwent x-rays and scans of his right arm and shoulder. The x-rays of the claimant's upper arm revealed degenerative changes in the AC joint, cortical irregularity, and a lytic lesion that was "not explained by [his] history." The CT scan produced findings that were "most consistent with

6

chronic osteomyelitis." The MRI of his right shoulder, which was compared to the x-rays and CT scan, showed that the claimant's bicep tendon was normal with no dislocation. However, the MRI revealed several conditions of concern, including a lesion, a supraspinatus (or rotator cuff) tear and mild acromioclavicular joint osteoarthritis.

¶ 20    Although he was referred to an orthopedic specialist, the claimant did not see the specialist because he believed his condition was "too far gone."  He later returned to Dr. Tu, who told him that there was nothing he could do because he had "fixed" the claimant's broken tendon and did not have "[any]thing to do with the rotator cuff tear."

¶ 21    A return-to-work verification letter, dated May 2012, indicated that the claimant should not perform any heavy lifting due to bursitis in his right shoulder and his history of bicep tendon rupture. After assessing the claimant's condition several months later, Dr. Singh concluded that the claimant could not lift or carry more than five pounds with his right arm and noted that the claimant had difficulty handling objects because of numbness in his right fingers.

¶ 22    The claimant acknowledged that he had torn a muscle in his right shoulder seven or eight years before his February 23, 2011, injury. He claimed, however, that he had recovered from his right shoulder injury and returned to performing physically demanding work as a diesel mechanic and quarryman without any lingering effects.

¶ 23    The claimant next testified regarding his work history after February 23, 2011. In summer 2012, a company hired the claimant to change tires and perform basic body work on cars. Because he was only offered minimum wage and worked slowly with his left hand to compensate for pain in his right arm, he felt unwanted and voluntarily left this job after

7

one week due to concerns that the company owner would lay him off. In winter 2012, a temporary staffing agency assisted the claimant in obtaining a job lifting and stacking 10-pound aluminum timing chain covers on an assembly line. Although he did "pretty good" at first, he nearly damaged some of the covers when his arm began hurting after several days and he received warnings from managers. Because he was having difficulty lifting the covers, the claimant voluntarily left this job after two weeks and declined his employer's request to "finish out" two more weeks. After the claimant quit, the staffing agency refused to assist him in finding other employment. In summer 2013, the claimant worked as a limo driver for two weeks and a taxicab driver for one month but resigned because he had difficulty lifting suitcases and was not satisfied with his income level.

¶ 24 In addition, the claimant testified regarding his job search efforts following February 23, 2011, which was also a requirement for obtaining unemployment insurance benefits. The claimant posted resumes on the internet using services provided by the Commission and the Illinois Department of Employment Security. He also drove around and left his contact information with three to four hundred employers, including automotive or "mechanic shops" and a canning company. Some employers told him that he was overqualified for minimum wage jobs because he made $15 an hour working for KTC, while others found him underqualified for automotive work because he did not have training with computerized scanners.

¶ 25 Lastly, the claimant testified about his physical condition at the time of the hearing. He still felt pain when he twisted his arm to the right or left and had difficulty lifting 10 or

8

20 pounds over his head more than once or twice. Dr. Singh was in the process of weaning him off prescription pain medication.

¶ 26 Entenberg, testified by deposition as follows. Entenberg, a nationally certified rehabilitation counselor and licensed clinical professional counselor, had been working in the vocational rehabilitation field since 1975. After interviewing the claimant on November 23, 2013, and reviewing his medical records, Entenberg evaluated the claimant as a candidate for vocational rehabilitation and prepared a report detailing her findings. Entenberg's report, which was admitted without objection, reflected that the claimant received unemployment insurance benefits from May 2011 to April 2013, and that he solicited employment by leaving his name and phone number with a number of employers, even if they were not hiring. Despite these efforts, the claimant did not receive any job offers. In addition to noting that the claimant had poor reading and spelling skills, Entenberg noted that he had never received workers' compensation.

¶ 27 Relying on the claimant's reported complaints of pain and numbness and medical records from Dr. Singh's office, Entenberg concluded that the claimant could not return to work as a truck mechanic but was a candidate for vocational rehabilitation "in the form of job placement." Entenberg opined that employment opportunities for the claimant included positions as a van driver, cashier, auto parts clerk and possibly an auto mechanic if he received additional training; however, he would earn less than before—estimating his earning capacity to be between $9-10 an hour. She believed that the claimant would be unable to find regular employment without professional help and that he would need a

vocational rehabilitation counselor, who could identify jobs within his limitations and teach him how to present himself "in the best manner" so he could get "placed into a job."

¶ 28   On December 9, 2014, the arbitrator issued a decision based on the foregoing evidence. The arbitrator found that the claimant's "right biceps tendon rupture" arose out of his employment with KTC and was causally related to his February 23, 2011, work accident, but that the "chronic osteomyelitis" in his right shoulder was not causally related to his employment-related injury. The arbitrator awarded the claimant 29-1/7 weeks of TTD benefits for the period from February 24, 2011, through September 15, 2011 (the date he was released to unrestricted work and found to be at MMI) pursuant to section 8(b) of the Act (820 ILCS 305/8(a) (West 2010)), and "50.6" weeks of PPD benefits for a 20% loss of use of his right arm. In doing so, the arbitrator denied the claimant's request for PTD. The arbitrator further ordered KTC to pay the reasonable and necessary medical expenses incurred by the claimant through September 15, 2011, pursuant to section 8(a) and 8.2 of the Act (820 ILCS 305/8(a), 8.2 (West 2010)).

¶ 29   On January 21, 2015, the claimant filed a petition for review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission). In the petition, he alleged that he received the arbitrator's decision on December 27, 2014. On May 17, 2016, the Commission issued a unanimous decision affirming and adopting the arbitrator's finding.

¶ 30   On June 27, 2016, the claimant sought judicial review of the Commission's decision in the circuit court of Cook County by filing a request to issue summonses, naming the

Commission, the Treasurer, and KTC as parties in interest. On June 7, 2017, the circuit court entered an order confirming the Commission's decision.

¶ 31   On appeal, this court remanded the cause to the circuit court for a determination of whether the claimant complied with the statutory requirements to perfect review; namely, sections 19(b) and 19(f)(1) of the Act, respectively. On remand the circuit court concluded that the claimant presented sufficient proof to establish that he had received the Commission's decision on June 8, 2016, and filed his appeal within the required 20 days to confer the court with subject matter jurisdiction. Pursuant to our mandate, the court then reinstated its June 7, 2017, order confirming the Commission's decision. This appeal followed.

¶ 32                                    II. Analysis

¶ 33   On appeal, the claimant contends that the Commission's decision affirming and adopting the arbitrator's (1) denial of benefits after September 15, 2011, and (2) award of PPD benefits for a 20% loss of use of his right arm, rather than odd-lot PTD benefits, was against the manifest weight of the evidence. We address these contentions in turn.

¶ 34   *a. Medical Expenses and TTD After September 15, 2011*

¶ 35    The claimant argues that the Commission's decision to deny benefits after September 15, 2011, is against the manifest weight of the evidence. Because his argument in this regard is premised on his claim that the Commission erred when it found that his shoulder condition is not causally related to his work accident, we first consider the Commission's finding on that issue.

11

¶ 36   To obtain compensation under the Act, the claimant must establish by a preponderance of the evidence that he suffered a disabling injury that arose out of and in the course of his employment. *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 591-92 (2005). Whether a causal relationship exists between a claimant's employment and his injury is a question of fact to be resolved by the Commission and its resolution of the issue will not be disturbed on review unless it is against the manifest weight of the evidence. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984). For the Commission's resolution of a fact question to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Tolbert v. Illinois Workers' Compensation Comm'n*, 2014 IL App (4th) 130523WC, ¶ 39. In resolving questions of fact, it is the function of the Commission to assess the credibility of the witnesses and assign weight to the evidence, including medical evidence. *ABF Freight System v, Illinois Workers' Compensation Comm'n*, 2015 IL App (1st) 141306WC, ¶ 19.

¶ 37    Here, the Commission found that the claimant's shoulder condition was not causally related to the accident. In particular, the Commission found that the chronic osteomyelitis in the claimant's right shoulder was unrelated to the ruptured tendon in the claimant's right arm, which occurred on February 23, 2011. The claimant testified that he had a prior injury to his right shoulder, but the medical records show that the claimant's right shoulder was normal when evaluated within days of the February 2011 accident. While the claimant testified that he experienced shoulder pain after having surgery on his tendon and the February 2012 scans revealed a torn rotator cuff, chronic osteomyelitis and osteoarthritis, Dr. Tu opined that these conditions were unrelated to the claimant's February 23, 2011,

12

accident. Because the Commission's finding is supported by the medical records and Dr. Tu's medical opinion, we cannot say that the opposite conclusion is clearly apparent.

¶ 38    Therefore, we conclude that the Commission's finding that the claimant's right shoulder condition is not causally related to his February 23, 2011, work accident is not against the manifest weight of the evidence. Having reached this conclusion, we also reject the claimant's arguments regarding the Commission's decision to deny medical expenses and TTD benefits after September 15, 2011, which are largely based on the claimant's contention that his shoulder condition is causally related to the February 23, 2011, work accident.

¶ 39    Pursuant to the Act, a claimant is entitled to compensation for medical treatment incurred "which is reasonably required to cure or relieve from the effects of the accidental injury***." 820 ILCS 305/8(a) (West 2011). The claimant bears the burden of proving, by a preponderance of the evidence, entitlement to an award of medical expenses under section 8(a). *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 546 (2007). Whether medical charges are reasonable or causally connected to a claimant's work-related injury "are questions of fact to be resolved by the Commission, and its resolution of such matters will not be disturbed on review unless against the manifest weight of the evidence." *Westin Hotel*, 372 Ill. App. 3d at 546. Here, the Commission awarded medical expenses relating to the claimant's torn bicep but denied medical expenses relating to his right shoulder condition. Because we have concluded that the Commission did not err in finding that the claimant's right shoulder condition is not causally connected to his work-related injury, we

13

conclude that the Commission's decision to deny medical expenses relating to his shoulder condition is not against the manifest weight of the evidence.

¶ 40    An injured employee is entitled to TTD benefits "from the time an injury incapacitates him for work until such time as he is as far recovered or restored as the permanent character of his injury will permit." *Interstate Scaffolding, Inc. v. Ill. Workers' Comp. Comm'n*, 236 Ill. 2d 132, 142 (2010). The "dispositive inquiry" is whether the claimant's condition has stabilized, that is, whether he has reached MMI. *Interstate Scaffolding, Inc.*, 236 Ill. 2d at 142. To be entitled to TTD benefits, the claimant has the burden to establish that he did not and could not work during the relevant period. *Holocker v. Illinois Workers' Compensation Comm'n*, 2017 IL App (3d) 160363WC, ¶ 34. The period during which a claimant is TTD is also a question of fact for the Commission and its resolution of the issue will not be disturbed unless it is against the manifest weight of the evidence. *Id.* ¶ 35; *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118, 119-20 (1990).

¶ 41    Here, the Commission found that the injury to the claimant's bicep tendon was causally related to his work accident, and that he reached MMI for that condition on September 15, 2011. The Commission's finding is supported by the medical records and opinions of Dr. Tu, which showed that Dr. Tu released the claimant to work without restrictions because the claimant experienced no complications following the March 18, 2011, surgery and the repaired tendon was functioning without "deficits" at the time of the September 15, 2011, examination. Specifically, the Commission noted Dr. Tu's medical findings that there were no deficits or difficulties with supination, flexion or range of

14

motion at that time. In addition, a February 2012 MRI confirmed that the tendon was fully repaired as it appeared "normal" with no dislocation. Thus, we cannot say that the Commission's finding is against the manifest weight of the evidence.

¶ 42    Accordingly, the Commission's decision to deny medical and TTD benefits after September 15, 2011, is not against the manifest weight of the evidence. We now turn our attention to the claimant's challenge to the Commission's decision to award PPD benefits, rather than odd-lot PTD benefits.

¶ 43    *b. Odd-Lot Permanent Total Disability Claim*

¶ 44    The claimant contends that the Commission's decision to award him PPD benefits for a 20% loss of use of his right arm is against the manifest weight of the evidence. He asserts that he met his burden of proving that he was entitled to an award of odd-lot PTD benefits.

¶ 45    Under the odd-lot theory, an employee must establish that he is unable to perform services except for those that are so limited in quantity, dependability, or quality that there is no reasonable stable market for his skills. *A.M.T.C. of Illinois, Inc. v. Industrial Comm'n*, 77 Ill. 2d 482, 487 (1979).  Therefore, when an employee is capable of performing some kind of work without seriously endangering his life or health, he is not entitled to permanent total disability benefits. *A. M. T. C. of Ill., Inc.,* 77 Ill. 2d at 487.

¶ 46    The employee must show that he is, for all practical purposes, unemployable, i.e., he is unable to perform any services except those that are so limited in quantity, dependability, or quality that there is no reasonably stable market for them.  *Marathon Oil Co. v. Industrial Comm'n*, 203 Ill. App. 3d 809, 815 (1990). A claimant can establish that

15

he falls within an odd-lot category by showing either: (1) a diligent, yet, unsuccessful job search; or (2) that his age, training, education, experience, and physical condition prevent him from engaging in stable and continuous employment. *Westin Hotel*, 372 Ill. App. 3d at 544. If the claimant establishes by a preponderance of the evidence that he falls within the odd-lot, the burden then shifts to the employer to show that work is actually available for the claimant. *Lanter Courier v. Industrial Comm'n*, 282 Ill. App. 3d 1, 5 (1996). Ultimately, whether a claimant falls into the odd-lot category is a factual determination to be made by the Commission, and that determination will not be set aside unless it is against the manifest weight of the evidence. *Westin*, 372 Ill. App. 3d at 544. A factual finding is against the manifest weight of the evidence if the opposite conclusion is "clearly apparent." *Swartz v. Illinois Industrial Comm'n*, 359 Ill. App. 3d 1083, 1086 (2005).

¶ 47 In this case, the Commission found that the claimant did not qualify for PTD benefits because he failed to prove that he fell within one of the odd-lot categories. First, the Commission determined that the claimant failed to provide sufficient evidence of a diligent and unsuccessful job search. Specifically, the Commission found that the claimant's job search was merely "perfunctory," and that his job search logs did not reflect a convincing job search effort. In support, the Commission noted that the claimant's efforts from September 15, 2011, to July 30, 2012, did not focus on employers who were hiring, and that he did not list the positions applied for or the qualifications or physical requirements for those positions. Based on our review of the record, we cannot say, here, "no rational trier of fact could have agreed with the Commission's decision." *Fickas v. Industrial Comm'n*, 308 Ill. App. 3d 1037, 1041 (1999).

16

¶ 48    The Commission also found that the claimant was employable and that he had employment opportunities in a reasonably stable job market. The Commission's finding is supported by the claimant's own testimony, which showed he secured several jobs following his injury but voluntarily left each job. Although the claimant quit each job due to his dissatisfaction with his earnings and perceived inability to perform adequately, he had been released to work without restrictions and produced no corroborating evidence to show he was unable to perform his job duties.

¶ 49    In light of the claimant's testimony, we cannot say that an opposite conclusion is clearly apparent.    Thus, based on the foregoing analysis, we conclude that the Commission's decision to deny PTD benefits is not against the manifest weight of the evidence.

### III. Conclusion

¶ 50    We find that the Commission's decision denying the claimant benefits after September 15, 2011, and awarding PPD benefits, rather than odd-lot PTD benefits, was not against the manifest weight of the evidence. Accordingly, we affirm the judgment of the circuit court of Cook County, which confirmed the Commission's decision.

¶ 51    Affirmed.