NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

FILED
September 29, 2020
Carla Bender
4th District Appellate
Court, IL

2020 IL App (4th) 200096WC-U
No. 4-20-0096WC
Order filed September 29, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FOURTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

_____

| | | |
|---|---|---|
| LAURA CAPONIGRO, | ) ) | Appeal from the Circuit Court of Sangamon County. |
| Appellant, | ) ) | |
| v. | ) ) | No.    18-MR-631 |
| THE ILLINOIS WORKERS' COMPENSATION COMMISSION, *et al.*, | ) ) ) | Honorable Dwayne A. Gab, |
| (Springfield Park District, Appellee). | ) | Judge, Presiding. |

_____

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Harris, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The Commission's finding that claimant failed to prove a causal connection between her occupational exposure to chemicals and her current condition of ill-being was not against the manifest weight of the evidence; (2) the Commission did not err in determining that respondent had no obligation to pay for prospective medical care where claimant failed to establish a causal connection between her current condition of ill-being and her work accident; (3) the Commission's finding that claimant was not entitled to temporary total disability benefits after she rejected a job offer within the restrictions of her treating physician was not against the manifest weight of the evidence; and (4) the Commission's award of a permanent partial disability benefit instead of a permanent total disability benefit was not erroneous.

¶ 2    Claimant, Laura Caponigro, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2012)) seeking benefits for injuries she allegedly sustained on May 7, 2013, while in the employ of respondent, Springfield Park District. Following a hearing, the arbitrator found that claimant sustained an accident that arose out of and in the course of her employment with respondent. The arbitrator awarded claimant 38 weeks of temporary total disability (TTD) benefits (820 ILCS 305/8(b) (West 2012)) and 50 weeks of permanent partial disability (PPD) benefits (820 ILCS 305/8(d)2, 8.1b (West 2012)). However, the arbitrator also found that claimant failed to prove that her current condition of ill-being was causally related to the accident, and, therefore, respondent had no obligation to pay for any additional medical treatment. The Illinois Workers' Compensation Commission (Commission) affirmed and adopted the decision of the arbitrator. On judicial review, the circuit court of Sangamon County confirmed the Commission's decision. Claimant now appeals, challenging the Commission's findings with respect to causal connection, prospective medical care, TTD benefits, and permanency benefits. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On October 9, 2013, claimant filed an application for adjustment of claim seeking workers' compensation benefits for injuries she allegedly sustained while in the employ of respondent. Claimant alleged that on May 7, 2013, while "[c]leaning urinals with a chemical," she sustained "[c]hemical irritant induced bronchial reactivity" affecting her lungs. The matter proceeded to an arbitration hearing before arbitrator Nancy Lindsay. The following factual recitation is taken from the evidence presented at that hearing, which was held on November 9, 2017.

¶ 5    Respondent operates a park district in Springfield, Illinois. Respondent employed claimant

as a part-time maintenance worker. On May 7, 2013, claimant was assigned to the Nelson Center, a multi-purpose facility run by respondent. The manager of the facility asked claimant to clean the locker rooms in preparation for the opening of the pool season. To that end, claimant retrieved some bleach from the supply closet, went into one of the locker rooms, poured bleach into the urinals, and let it sit. Claimant testified that as she was cleaning out some lockers, a cloud of smoke formed and she had difficulty breathing. Claimant stepped outside for some fresh air, but that made her symptoms worse. Claimant proceeded to her manager's office and was instructed to seek medical attention.

¶ 6    Claimant initially presented to an urgent-care facility. An X ray of the chest was interpreted as negative. Claimant was treated with oxygen and a nebulizer and instructed to go to the emergency room if her symptoms persisted. Claimant reported to the emergency room at St. John's Hospital the same evening with complaints of shortness of breath and heaviness in the chest with inhalation. Claimant was prescribed Prednisone and Norco. The emergency-room physician advised claimant to avoid smoking and follow up with her primary-care physician, Dr. Leticia Drapiza. Claimant saw Dr. Drapiza on May 10, 2013. Upon examination, Dr. Drapiza noted that claimant's lungs were clear bilaterally on auscultation, with no wheezing or crackles. Due to continued complaints of shortness of breath, Dr. Drapiza prescribed Ventolin and Advair. She also refilled claimant's Norco. Claimant returned to the emergency room at St. John's Hospital on May 27, 2013, with chest pain and shortness of breath. The doctor, noting that claimant's condition had not resolved nearly three weeks after the chemical exposure, advised claimant to see a pulmonologist.

¶ 7    On June 18, 2013, claimant saw Dr. David Crabtree of Central Illinois Allergy &

Respiratory Service, Ltd., for a pulmonary consultation. At that time, claimant reported persistent shortness of breath, chest tightness, and cough after an occupational exposure to chlorine gas. Dr. Crabtree noted that chlorine gas is often a major irritant and can cause damage to the airways. Dr. Crabtree noted that claimant was a smoker, but reportedly stopped as of May 7, 2013, since breathing was difficult. In addition, Dr. Crabtree examined claimant, performed pulmonary testing, and ordered chest X rays. Claimant's examination "was completely negative with no adventitious lung sounds appreciated" and her chest X ray was normal. Dr. Crabtree diagnosed acute bronchitis, bronchiolitis, and subacute obliterative bronchiolitis. He prescribed Advair, Albuterol, Augmentin, and Prednisone. He advised claimant not to smoke and recommended that she avoid exposure to chemicals, dust, and second-hand smoke. Dr. Crabtree ordered a computed tomography (CT) scan of the chest.

¶ 8       By July 2, 2013, Dr. Crabtree noted that claimant seemed a little better, but still complained "vehemently" of dyspnea. Dr. Crabtree wrote that the findings on claimant's CT scan were consistent with the acute lung inhalation injury that she described. He also noted that claimant's pulmonary-function testing (PFT) had "improved significantly *** with her lung volumes (less restriction) and her DLCO [diffusing capacity of the lungs for carbon monoxide] *** better as well." Dr. Crabtree questioned why claimant "so vehemently complains of the chest symptoms" as "the symptoms are not at all consistent with the clinical, exam, and radiographic findings." Dr. Crabtree did not expect complete healing for several months, and he kept claimant off work as she finished the Prednisone and continued her inhaler regimen.

¶ 9       Claimant next saw Dr. Crabtree on August 20, 2013. On that date, claimant reported that her dyspnea was worse. Pulmonary tests indicated an improvement in claimant's lung volume but

a positive methacholine challenge. Dr. Crabtree noted that claimant presented with a difficult situation, stating, "[w]ith her improved lung volumes and diffusion capacity I would expect that she has healed the injury from the inhalation and if she is having symptoms it may be the Asthma-like condition for which she appears to now be suffering from?? The cause and effect of this underlying process is impossible to sort out completely but I do agree it is not likely due to RADS [reactive airways dysfunction syndrome] of a non-immunologic mechanism. I do not think this far out that she is still at risk from being in the work place with the obvious exception of Chlorine inhalation." Dr. Crabtree advised claimant to continue her inhaler regimen and noted that he wanted to see the results of an independent medical examination (IME) which had been scheduled.

¶ 10    At respondent's request, claimant saw Dr. Peter Tuteur for an IME on August 29, 2013. As part of the IME, Dr. Tuteur secured a history from claimant, reviewed medical records from St. John's Hospital and Dr. Crabtree, and performed laboratory testing. The laboratory data included a chest X ray, CT scan, pulmonary-function testing, and methacholine-challenge test. Claimant told Dr. Tuteur that she experiences exacerbation in response to a wide variety of situations, including high heat and humidity, exercise, and chemical smells. Claimant reported that she was unable to walk her dog or clean her home and that perfumes, colognes, and hairsprays initiate chest heaviness and breathlessness. Claimant noted that she leaves the room when cooking is taking place and that Carpet Fresh and ambient tobacco smoke exacerbate her symptoms. Dr. Tuteur noted that claimant began smoking at age 13 and continued until age 37, typically at the rate of four cigarettes per day. Claimant reported that since the episode in May, her cigarette use had decreased to half a cigarette per day and she began wearing a nicotine patch. Nevertheless, Dr. Tuteur noted that there was "persistent environmental tobacco smoke emanating from her mother's

smoking in the house in which they both live, as well as in the automobile during the 2 hour car ride" to the examination. Dr. Tuteur noted that claimant's chest X ray was "perfectly normal." The CT scan revealed extensive mediastinal and hilar calcification consistent with old healed granulomatous disease as well as irregular heterogeneously distributed bronchial wall thickening of the smaller visible airways. There were no nodular densities or emphysema. The pulmonary-function testing was normal except for a reduced ERV (expiratory reserve volume) consistent with claimant's "mild overweight status." The methacholine-challenge test was "markedly positive," but reversal took place with Albuterol. Dr. Tuteur diagnosed chemical-induced bronchial hyperactivity. He specified that this condition was not an allergic phenomenon, but due to "the exposure to irritant low molecular weight chemicals such as the compounds generated when bleach is added to hydrochloric acid solution." Dr. Tuteur recommended that claimant maintain "exquisite environmental control" to avoid exposure to triggers. Dr. Tuteur stated that claimant should not return to work at the Nelson Center or any other environment associated with the presence of triggers. He opined that, ideally, a home-based work situation should be sought. Lastly, Dr. Tuteur counseled claimant that her home should be free of ambient tobacco smoke and cleaning solutions and that exhaust fans should be used to eliminate cooking fumes.

¶ 11    Claimant followed up with Dr. Crabtree on October 1, 2013, with complaints of shortness of breath and coughing. Claimant informed Dr. Crabtree that Dr. Tuteur felt that she "should not be at work in the short and long term in the environment she was in and the job description that she had there." Dr. Crabtree kept claimant on the same medication regimen and recommended that she avoid exposure to triggers that may aggravate her condition.

¶ 12    Claimant was next seen by Dr. Crabtree on December 2, 2013. At that time, Dr. Crabtree

wrote: "Since we last saw [claimant], she is still coughing and SOB [shortness of breath] by report but she sure looks pretty good. She has a PFT that now shows all normal with a very mild reduction in her diffusion capacity." Regarding claimant's work status, Dr. Crabtree remarked, "I do not nor did I ever say that this patient can not [*sic*] work, I simply said and am saying that she should not be exposed to chemicals that she used in the job she was in. She can do any other work that does not include exposure to chemicals. I have nothing else to add for her underlying illness as she is baseline and not likely to worsen from here. The reactivity (Methacholine positivity) is resolved with increased advair strength so I doubt there is anything else reversible at this time." Claimant returned to work for respondent on December 6, 2013, answering phones at the Nelson Center. She continued to work for respondent through March 3, 2014.

¶ 13     Claimant saw Dr. Crabtree on March 4, 2014. Dr. Crabtree noted that since returning to work, claimant began to experience more frequent episodes of coughing, congestion, and wheezing. He indicated that claimant was getting slowly better, but now, by her report, she was not getting along nearly as well as she had before returning to work. Claimant related one episode of chemicals being used by a plumber that threw her into an "attack." Claimant also reported waking up frequently at night with coughing and shortness of breath that had also been recent in occurrence. Dr. Crabtree noted that this in and of itself would not make him think of work exposures, but this was not apparent prior to claimant returning to work. Dr. Crabtree also noted that claimant's PFT was normal, "other than the methacholine that dropped *** by 21% with a single breath" which was "much more significant of a drop than she has had on any prior PFT/methacholine." Claimant reported that she did not smoke and that she is never around smoke anymore because it causes her to cough, but Dr. Crabtree noted that claimant's serum nicotine and

cotinine levels were both well above the limit for smokers, let alone second-hand exposure. As a result, Dr. Crabtree opined that claimant was still smoking and "this is not going to allow her lungs to heal and is also much more likely a trigger to ongoing symptoms than anything in the work place with her new area away from the chemicals." Based on the recent exacerbations, Dr. Crabtree took claimant off work. Dr. Crabtree noted that "It will not be possible to keep her lungs improved if she does not comply with smoking cessation totally and completely now and forever."

¶ 14    Claimant returned to Dr. Crabtree on April 8, 2014. Claimant reported that her symptoms had improved, which she attributed to the fact that she had been away from her prior work environment. Dr. Crabtree noted, "I wish I could have more tools than I presently have as I am unsure if this young woman truly has acute disease or [if] she actually does not want to work. I have evaluated her as best I can and for all of the work related issues that she has had and while it remains in question the data would suggest that she is not feigning these episodes. I had obtained a Nicotine and Cotinine levels both of which were quite high but it was told to me for the first time that [claimant] has been on a Nicotine patch for over a year since the time that she claimed smoking cessation. Will continue to monitor after work related exposure issues can be explored we will have to make a decision about her ability to work. Again, I know this young woman is able to work but are these exposures in the workplace at the Nelson Center too much for her to tolerate?? [*sic*]"

¶ 15    Claimant saw Dr. Crabtree for the last time on May 8, 2014. Dr. Crabtree noted that claimant continued to describe increasing incidents of asthma. A peak-flow meter administered to claimant did not show any significant variability even when claimant related terrible symptoms. Dr. Crabtree remarked:

"I wish there was more to do, but it does appear that this lady is left with persistent bronchospasm post inhalation injury in the workplace having inhaled a high concentration of Chlorine gas while cleaning toilets at her place of employment. Since that time she relates very significant episodes of SOB and wheezing that are triggered by increasingly lower level triggers. Her description of her symptoms are [*sic*] out of proportion to the objective findings we have had for her all along. It appears going back to work with the [respondent] will not be possible but I by no means feel that this lady is permanently or totally disabled. She describes her triggers as many and very small amounts of these substances are required to cause her to 'exacerbate.' "

Dr. Crabtree recommended that claimant avoid triggers in a trial by error manner. He also recommended that claimant avoid extreme weather conditions less than 10 degrees Fahrenheit and greater than 90 degrees Fahrenheit, extreme dust and dirty environments, and smoke.

¶ 16    Thereafter, respondent offered claimant a job at its zoo gift shop with a starting date of June 8, 2014. Claimant testified that the gift shop at the zoo is located adjacent to the concession stand. She stated that there are animals in the lobby and there is only one small window leading to the outside. Claimant did not accept the position at the zoo. At the end of June 2014, claimant moved to Michigan City, Indiana. Claimant testified that she moved because her mother was going to Indiana and her mother was her "means of income."

¶ 17    The record does not contain any evidence that claimant sought medical treatment between May 8, 2014, and mid-September 2014. On September 14, 2014, claimant reported to Franciscan St. Anthony Memorial Hospital in Michigan City for neck pain and cellulitis of the face. At that time, claimant made no mention of any pulmonary complaints, and on physical examination,

claimant's pulmonary/chest was interpreted as "[e]ffort normal and breath sounds normal." Claimant was also seen at St. Anthony Memorial Hospital on April 3, 2015, at which time she was diagnosed with a headache.[1]

¶ 18    Claimant was under surveillance on August 3 and 4, 2016. On Wednesday, August 3, 2016, claimant was seen in the morning going to a pet supply store and a resale store. Later that afternoon, claimant was seen going to a Dollar General store, a Family Dollar store, and Walmart. Claimant was seen smoking in the video. Claimant was also observed eating at a McDonald's restaurant for approximately 30 minutes. On Thursday, August 4, 2016, claimant was seen at an auto repair shop and a gas station. Claimant was seen exiting the gas station with a pack of cigarettes. Later that day, claimant was seen at Indiana Beach Amusement Park.

¶ 19    Dr. Tuteur issued a supplemental report on November 21, 2016, after being provided additional information, including records from Springfield Clinic (October 10, 2007 through June 12, 2013), Dr. Crabtree (May 7, 2013, through May 8, 2014), Cool Spring Health Center (May 15, 2015), Dr. Dickover (June 24, 2015), as well as a CT scan dated February 21, 2007, and a surveillance report dated August 5, 2016. Dr. Tuteur noted that claimant's attempts to return to work had been unsuccessful and she had moved to Indiana, where she established general and pulmonary medical care, reporting intermittent symptoms and the discontinuation of cigarette smoking. Trigger-initiated respiratory symptoms persisted, albeit at a reduced level of severity.

---

[1] The arbitrator's decision also references treatment received at St. Anthony Memorial Hospital on December 7, 2014, and from a pulmonologist, Dr. Brian Dickover. However, the record on appeal does not include the treatment notes for these visits.

Dr. Tuteur wrote, "No direct comment is made with respect to how fastidiously environmental control was followed. Continued medication with an inhaled corticosteroid, long-acting Beta2 agonists and rescue inhaler is documented." He noted the surveillance video showed that over a two-day period claimant smoked a single cigarette and carried a pack of cigarettes and was able to climb an unquantified number of stairs without difficulty. Dr. Tuteur stated that non-compliance with environmental control (particularly lack of complete tobacco smoking cessation) would be likely to adversely affect claimant's health status. However, even if cessation were complete it would not resolve the condition of bronchial reactivity. Dr. Tuteur reiterated his diagnosis of irritant-induced bronchial reactivity, sometimes referred to as RADS. Dr. Tuteur felt that claimant's diagnosis was directly related to her exposure on May 7, 2013. He felt it was quite likely that she had reached maximum medical improvement in terms of the severity of the underlying bronchial activity. He felt that there was insufficient data available to identify claimant's ability to engage in remunerative activity. She would require an environment where she would not be exposed to triggers that would exacerbate the function of her airways. "A careful documented history with respect to what currently serves as such triggers and how that might impact employment needs to be determined." With regard to working in an "air conditioned gift shop," Dr. Tuteur opined that such an environment "may not be appropriate insomuch as patrons could bring to this environment perfumes, colognes, hair spray, etc. which may serve as a trigger to produce bronchoconstriction." Dr. Tuteur felt that the best work environment for claimant would be at home, where she would be able to control the ambient space.

¶ 20    Dr. Tuteur testified via evidence deposition on December 8, 2016. At the deposition, Dr. Tuteur reiterated his opinion that claimant suffered from chemically-induced bronchial reactivity

which he causally related to the May 7, 2013, exposure at work. Regarding treatment, Dr. Tuteur recommended medication and environment control to minimize episodes of triggers that exacerbate claimant's condition. Claimant advised Dr. Tuteur that her triggers included perfumes, colognes, hairsprays, chemical smells, and high heat and humidity. He did not feel she could return to work as a janitor because she would be exposed to a variety of cleaners that would likely trigger an exacerbation. Dr. Tuteur testified that to avoid the triggers, the ideal work would be home-based in which claimant could control her environment. Dr. Tuteur did not believe that the gift-shop position, or any retail position, was appropriate as claimant would be exposed to perfume, cologne, and cleaning agents. Dr. Tuteur agreed that he did not perform any tests to determine if the triggers that claimant identified actually exacerbated her condition. He acknowledged that she could do telemarketing out of her home. He felt she had reached maximum medical improvement in 2013 but had no current opinion on that.

¶ 21     Claimant came under additional surveillance between May 13 and May 15, 2017. On Sunday, May 14, 2017, claimant was observed smoking in a vehicle before traveling with a male companion to a Burger King drive-thru, a Dollar Tree store, and a Family Dollar store. Claimant was seen leaving one of the stores with a container of laundry detergent. After getting into the vehicle, claimant was again observed smoking. Claimant then returned home before going to the Family Dollar store again and to a cigarette discount store. On Monday, May 15, 2017, claimant was seen walking two children to a nearby school.

¶ 22     Dr. Crabtree testified by evidence deposition on June 19, 2017. Dr. Crabtree stated that claimant sustained RADS or some persistent airway reactivity because of the May 7, 2013, incident. Dr. Crabtree noted that RADS is usually not a permanent process and that the lungs will

usually heal in "months and maybe a year." What perplexed Dr. Crabtree was that claimant's persistent complaints did not fit the typical pattern of RADS. Dr. Crabtree testified that claimant would need to continue to take her prescription medication until the time she has no symptoms and it is proven by pulmonary-function testing that she is no longer reactive to different substances. Dr. Crabtree testified that smoking alone could cause a permanent bronchi reactivity. The last time that Dr. Crabtree saw claimant, he felt that the description of her symptoms was out of proportion with the objective findings. Dr. Crabtree did not see findings consistent with claimant's complaints based on his exam, chest X ray, pulmonary-function testing, or peak-flow test. Asked whether his objective findings led him to question claimant's credibility with regard to the symptoms she was describing, Dr. Crabtree responded:

"That's the exact purpose of that trial was to determine what the cause of her symptoms are, I mean not exactly what, but if they are lung related, and I often do that. Dyspnea is a very nebulous symptom, and oftentimes there can be multiple components. So, if someone is having severe dyspnea and their pulmonary function is not changing, it is unusual or very unlikely that it is lung related. So, yes, that brought up whether her description of her symptoms was real or whether it is real and due to a different problem."

Dr. Crabtree testified, therefore, that he had no objective evidence that claimant's complaints were the result of her lungs. Dr. Crabtree further testified that while claimant indicated that she had quit smoking, the test that he performed did not support this, and he felt that some of her symptoms could be related to cigarette smoking. Regarding claimant's work status, Dr. Crabtree opined that claimant could work. He testified that this would be a trial and error process. Dr. Crabtree testified that any job that did not require exposure to cleaning chemicals would be safe for claimant.

¶ 23    Claimant presented to the office of Dr. Alexander Molina on July 26, 2017, "to get established and for some breathing issues." Claimant reported a history of "chemical lung burn." Claimant told Dr. Molina that she experiences occasional shortness of breath and has a slight cough. She also reported that over the prior month, she had to use her nebulizer more and that her lungs felt worse. Dr. Molina ordered a chest X ray, which was interpreted as normal. Dr. Molina diagnosed claimant with non-asthma-related reactive airway disease, prescribed Prednisone, and advised her to follow up in one month.

¶ 24    Claimant was next seen by Dr. Molina on October 4, 2017. Claimant complained of left-sided chest pain and mid- to upper-back pain. Claimant also reported having a cough and requested a referral to a pulmonologist. Claimant noted that she saw Dr. Dickover a couple of years earlier but did not care for him. The record states, "[h]ad exposure to bleach from her previous work. She blames her breathing issues on that although she did smoke for about 20 years."

¶ 25    Claimant was last seen by Dr. Molina on November 1, 2017. The history in that record states, "[Claimant] is a 41 y.o. female who is here today for several issues. She states that she has had a lot of stress over the past few months. She is going through a lawsuit against a former employer and she is very nervous about it." Claimant reported a continued cough. She also related that she started smoking again due to stress. The physical examination of claimant's pulmonary/chest was interpreted as "[e]ffort normal and breath sounds normal. No accessory muscle usage. No apnea and no tachypnea. No respiratory distress. She has no decreased breath sounds. She has no wheezes. She has no ronchi. She has no rales." Claimant was prescribed Duo-Neb, and it was noted that claimant was scheduled to see a pulmonologist in December.

¶ 26    Edward Pagella, a licensed vocational rehabilitation consultant, met with claimant on

January 9, 2017, at the request of her attorney. As part of his assessment, Pagella reviewed claimant's medical records and the deposition of Dr. Tuteur. After the meeting, Pagella generated a report. After reviewing the medical information, Pagella opined that claimant would be relegated to a position working in a controlled environment in her home. Pagella further opined that a labor market does not exist for a home-based job for claimant since she is qualified for an unskilled occupation. On cross-examination, Pagella testified that he did not review the deposition of Dr. Crabtree and that he was not aware that Dr. Crabtree thought claimant's description of her symptoms were out of proportion to his objective findings. Pagella was also unaware that Dr. Crabtree felt that claimant was not permanently and totally disabled.

¶ 27    At the arbitration hearing, claimant testified that her chest felt "very heavy." Her nebulizer medicine has been increased to a higher dosage because of her breathing and she sleeps in a recliner chair because she cannot lie flat due to the inability to breathe. Claimant further testified that everyday activities are getting more difficult for her. She testified that she is homebound, although she does push herself to go out and do things with her children as her abilities allow. Claimant testified that she still smokes due to stress. Claimant's mother also smokes, but not in the house. Claimant testified that there are pets in the house—dogs, a rabbit, and a guinea pig. Claimant testified that when she is around people with cologne, she cannot breathe. She related that when she was in the bathroom at the hearing site, she had to keep her face in her shirt because there was a body spray in the bathroom that someone had sprayed and it was very strong and she could not breathe. Claimant denied any breathing or lung problems prior to the chemical exposure on May 7, 2013.

¶ 28    On cross-examination, claimant identified respondent's exhibit No. 9 as Facebook posts

by herself, her daughter, and her son. The first post, dated December 19, 2013, indicated that claimant attended a professional football game with her boyfriend at a domed stadium in St. Louis on November 24, 2013. Claimant acknowledged that at that time, she was receiving TTD benefits. A post dated November 12, 2014, provided, "Way too early to be up waiting on a train!! But well worth it. I get to visit my amazing friend." Claimant testified that the only reason she would be on a train would be to go to court. Another post from November 12, 2014, stated, "Getting ready to go out!! #girlsnightout #lovemylife #anythingcanhappenlol." Claimant denied posting the message or going out anywhere. Claimant testified that her daughter may have posted the item. Claimant's daughter would have been 10 years old on that date. A post dated July 3, 2016, stated "Happy Fourth of July getting are [*sic*] buckets of drink on Cheryl Sanchez." Claimant testified that this was at her aunt's yard in LaPorte, Indiana. An August 1, 2016, post provided, "Six more days and I am heading to Chicago for some much needed relax and drinking time." Claimant did not know how that post got there. Claimant testified that she was heading to Chicago to her grandmother's house. An August 4, 2016, post noted that claimant was on her way to Indiana Beach water park. Claimant was aware that surveillance video showed her at the water park. Claimant testified that she went there for her children. A post dated August 7, 2016, stated "Chicago here I come with Mercedes Smithand [*sic*] Larry Lilbird Caponigro." Claimant testified that those individuals are her brother and his fiancé. Claimant testified that her brother drove to Chicago to get something to eat on Maxwell Street while claimant stayed in the car. A post dated September 15, 2016, noted that claimant was on a field trip to the County Line Orchard with her children's school. Claimant testified that she was able to control everything she did at the orchard. An October 9, 2016, post stated, "On our way back home had a great time with friends and family for my cousin Jaclyn

Sanchez [*sic*] baby shower!" Subsequent posts from October 2016, indicated that claimant attended her daughter's volleyball games. Claimant testified that the volleyball games were played in a big gymnasium. A post dated October 23, 2016, indicated that claimant drove to Michael Jackson's childhood home in Gary, Indiana.

¶ 29    Derek Harms testified that he has worked for respondent for 10½ years, the last five as respondent's executive director. Harms testified that respondent operates one of the largest park districts in Illinois, employing 90 full-time workers and, depending on the season, between 100 to 400 part-time workers. Respondent operates dozens of recreational facilities throughout the community, including ice rinks, golf courses, a botanical garden, a carillon, a zoo, a tennis center, preschools, and 35 parks. Harms testified that respondent does everything it can to put people back to work. Harms testified that respondent's diversity allows it to offer different types of employment for individuals with restrictions. Harms acknowledged claimant was apprehensive about working at the zoo gift shop, but testified that respondent would have offered claimant other work opportunities if the zoo position was not acceptable. He testified, for instance, that claimant could have done filing or prepared mailings at the administrative office, which is in a controlled environment. Harms testified that it would be a trial and error process to determine what would work for claimant.

¶ 30    Based on the foregoing evidence, the arbitrator concluded that claimant sustained an accident that arose out of and in the course of her employment with respondent on May 7, 2013. The arbitrator awarded claimant 38 weeks of TTD benefits pursuant to section 8(b) of the Act (820 ILCS 305/8(b) (West 2012)) encompassing two distinct periods, from June 17, 2013, through December 5, 2013, and from March 4, 2014, through June 7, 2014. The arbitrator also awarded

claimant 50 weeks of PPD benefits, representing 10% loss of use of the person as a whole. 820 ILCS 305/8(d)(2), 8.1b (West 2012). However, the arbitrator concluded that claimant failed to prove that her "current condition since her last visit with Dr. Crabtree in May 2014 is a result of the May 7, 2013 exposure." The arbitrator based this finding on the "lack of [a] current causation opinion, significant gaps in treatment, and [claimant's] significant credibility issues." Given her causation finding, the arbitrator also determined that respondent had no obligation to pay for any additional medical treatment. Thereafter, claimant sought timely review with the Commission. The Commission unanimously affirmed and adopted the decision of the arbitrator. Claimant then sought judicial review in the circuit court of Sangamon County. Following a hearing, the circuit court confirmed the decision of the Commission. This appeal by claimant ensued.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, claimant challenges the Commission's findings with respect to causal connection, prospective medical care, TTD benefits, and permanency benefits. We address each contention in turn.

¶ 33                                    A. Causation

¶ 34    Claimant first argues that the Commission's decision that her current state of ill-being is not causally related to her work accident was against the manifest weight of the evidence. To recover compensation under the Act, an employee must prove by a preponderance of the evidence all elements of his or her claim, including that he or she sustained an industrial injury and that a causal connection exists between the injury and his or her employment. *Boyd Electric v. Dee*, 356 Ill. App. 3d 851, 860 (2005). An occupational activity need not be the sole or principal causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Sisbro, Inc. v.*

*Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003); *Freeman United Coal Mining Co. v. Industrial Comm'n*, 308 Ill. App. 3d 578, 586 (1999). Whether a causal relationship exists between a claimant's employment and his or her condition of ill-being is a question of fact to be resolved by the Commission. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984); *Bolingbrook Police Department v. Illinois Workers' Compensation Comm'n*, 2015 IL App (3d) 130869WC, ¶ 52. It is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicting evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). This is especially true with respect to medical issues, where we owe heightened deference to the Commission due to the expertise it possesses in the medical arena. *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 566 (1979). As a reviewing court, we cannot reject or disregard permissible inferences drawn by the Commission simply because different or conflicting inferences may also reasonably be drawn from the same facts, nor can we substitute our judgment for that of the Commission on such matters unless the Commission's findings are against the manifest weight of the evidence. *Zion-Benton Township High School District 126 v. Industrial Comm'n*, 242 Ill. App. 3d 109, 113 (1993). A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Elgin Board of Education School District U-46 v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 943, 949 (2011).

¶ 35     Applying the foregoing standards, we cannot say that the Commission's determination that claimant failed to prove a causal connection between her current condition of ill-being and her occupational exposure to chemicals on May 7, 2013, was against the manifest weight of the evidence. In affirming and adopting the arbitrator's decision that claimant failed to prove causation, the Commission cited: (1) the lack of a "current causation opinion;" (2) "significant

gaps" in claimant's medical treatment; and (3) claimant's "significant credibility issues." Each of these justifications finds ample basis in the record.

¶ 36    Regarding causation, both Dr. Crabtree and Dr. Tuteur opined that claimant sustained chemically-induced bronchial reactivity as a result of her exposure to chemicals while working for respondent on May 7, 2013. However, such opinions do not compel a finding that claimant's condition of ill-being since her last visit with Dr. Crabtree in May 2014 was causally related to the occupational exposure. It is clear from a review of Dr. Tuteur's deposition testimony that his opinion was based on his examination of claimant on August 29, 2013. This examination occurred just 3½ months after the work accident but more than 8 months prior to claimant's last visit with Dr. Crabtree. Claimant does not direct us to any evidence from Dr. Tuteur in which he affirmatively states that claimant's *current* condition of ill-being was causally related to her chemical exposure at work. Given this record, the Commission could reasonably conclude that Dr. Tuteur's opinion in no way supports a finding that claimant's condition of ill-being since her last visit with Dr. Crabtree in May 2014 was causally related to the exposure to chemicals at work on May 7, 2013.

¶ 37    Similarly, the Commission could reasonably conclude that the records and testimony from Dr. Crabtree did not support a finding that claimant's condition of ill-being since her last visit with him was causally related to the occupational exposure to chemicals. Dr. Crabtree treated claimant on eight occasions between June 18, 2013, and May 8, 2014. During this course of treatment, Dr. Crabtree repeatedly questioned claimant's credibility. For instance, in July 2013, Dr. Crabtree noted that claimant's symptoms were "not at all consistent with the clinical, exam, and radiographic findings." In December 2013, claimant reported coughing and shortness of breath,

but Dr. Crabtree noted that claimant "looks pretty good" and her pulmonary-function testing was "normal with a very mild reduction in diffusion capacity." In April 2014, Dr. Crabtree questioned whether claimant "has [an] acute disease or [if] she actually does not want to work." When Dr. Crabtree last saw claimant in May 2014, claimant related very significant episodes of shortness of breath and wheezing. However, a peak flow meter administered to claimant did not show any significant variability even though claimant related terrible symptoms. Dr. Crabtree commented that claimant's description of her symptoms was "out of proportion to the objective findings we have had for her all along." At his deposition, Dr. Crabtree testified that if someone is experiencing severe dyspnea and their pulmonary function is not changing, "it is unusual or very unlikely that it is lung related." Dr. Crabtree added that this made him question "whether [claimant's] description of her symptoms was real or whether it is real and due to a different problem." As noted above, it was claimant's burden to prove all elements of her claim, including a causal relationship between her current condition of ill-being and her employment. *Boyd Electric*, 356 Ill. App. 3d at 860. Given Dr. Crabtree's concerns about claimant's credibility and his finding that claimant's subjective complaints were not supported by his objective findings, the Commission had sufficient evidence before it from which to reasonably conclude that claimant failed to establish that her condition of ill-being after she last saw Dr. Crabtree in May 2014, was causally connected to her chemical exposure at work.

¶ 38     Despite this evidence, claimant takes issue with the Commission's determination that the record lacks a "current causation opinion." Claimant notes, for instance, that Dr. Tuteur wrote in his initial report that "[u]nequivocally, [claimant] has chemical (irritant) induced bronchial hyperactivity" and that this condition was "not an allergic phenomenon, but one due to the

exposure to irritant low molecular weight chemicals such as the compounds generated when bleach is added to hydrochloric solution." However, this report was authored shortly after Dr. Tuteur's examination of claimant late in August 2013, less than four months after her chemical exposure at work. Therefore, these comments from Dr. Tuteur's report do not reflect his opinion that claimant's "current condition since her last visit with Dr. Crabtree in May 2014 is a result of the May 7, 2013 exposure." For the same reason, we find misplaced claimant's reliance on a passage from Dr. Crabtree's deposition in which he testified that following his examination of claimant on August 20, 2013, there was "not a doubt" that claimant was suffering from a work-related pulmonary condition. It was undisputed that claimant suffered a work-related injury as a result of her chemical exposure at work. The issue in dispute was whether claimant's condition of ill-being after May 8, 2014, was causally related to that exposure.

¶ 39    Claimant also points out that Dr. Crabtree was asked at his deposition taken on June 19, 2017, what claimant's diagnosis would be "today." He responded, "Reactive Airways Dysfunction Syndrome or some other persistent airway reactivity." In follow up to that question, Dr. Crabtree was asked if that condition was causally related to the inhalation of chemicals at work on May 7, 2013. Dr. Crabtree answered, "[t]hat is correct," adding that the condition was not related to smoking. Claimant suggests that Dr. Crabtree's testimony implies that her condition of ill-being as of the date of his deposition testimony was causally related to her work occupational exposure to chemicals. We disagree. As noted above, Dr. Crabtree testified that if someone has severe dyspnea but his or her pulmonary function remains unchanged, it is unlikely that the condition is lung related. After noting that claimant's subjective complaints were out of proportion to his objective findings, Dr. Crabtree concluded that there was no objective evidence that claimant's

complaints were the result of RADS-related lung issues. Based on this evidence, the Commission could have concluded that while claimant may still have RADS, she failed to establish that her condition of ill-being after May 8, 2014, was causally related to her chemical exposure at work where she failed to exhibit any objective symptoms of the lungs. This was a reasonable conclusion based on the evidence of record.

¶ 40    Claimant also references Dr. Tuteur's deposition, which was taken on December 8, 2016. Claimant notes that Dr. Tuteur diagnosed "chemically induced bronchial reactivity." Claimant further notes that Dr. Tuteur testified that he was able to "relate" this diagnosis to the chemical exposure that occurred at work on May 7, 2013. However, Dr. Tuteur did not specify that claimant's condition of ill-being after May 8, 2014, was causally related to her chemical exposure at work. As such, we find unpersuasive claimant's reliance on these passages from Dr. Tuteur's deposition.

¶ 41    The Commission also cited "the significant gap in medical treatment since May/June 2014" in support of its causation finding. The Commission found it "suspect" that claimant resumed medical treatment just months before trial. Again, there is ample evidence of record to support the Commission's conclusion. In this regard, the record demonstrates that shortly after claimant saw Dr. Crabtree on May 8, 2014, she moved to Indiana. Following the move, claimant was not seen by a doctor until September 14, 2014, when she presented to Franciscan St. Anthony Memorial Hospital. Claimant was seen at Franciscan St. Anthony Memorial Hospital on multiple occasions between September 14, 2014, and April 3, 2015, for various maladies. However, the hospital records do not reference any pulmonary complaints during this time. There is no record of claimant receiving any medical treatment between April 3, 2015, and July 26, 2017, when she began seeing

Dr. Molina "to get established and for some breathing issues." During this two-year gap in treatment, claimant remained active and did not limit her activities to avoid potential environmental triggers as demonstrated by the surveillance evidence and social-media posts. Given this evidence, the Commission could have reasonably concluded that claimant failed to establish that she had any pulmonary-related complaints during this time.

¶ 42    Claimant insists that this court should reject the Commission's reliance on the gap in medical treatment because respondent "failed its basic responsibility of providing reasonable and necessary medical care" and created "barriers for her to receive treatment that would have eliminated 'gaps in treatment.' " We find this argument disingenuous given that claimant affirmatively sought medical treatment for other issues after moving to Indiana and sought to reestablish treatment for her alleged "breathing issues" just months before the arbitration hearing, even requesting a referral to a pulmonologist.

¶ 43    Finally, the Commission's finding that claimant's credibility was significantly compromised was supported by the evidence of record. In this regard, we note that Dr. Crabtree consistently documented that claimant's subjective complaints were not supported by his objective findings. Moreover, claimant's testimony that she has essentially been homebound as a result of the May 7, 2013, chemical exposure was strongly contradicted by the surveillance evidence and social-media posts. This evidence demonstrated that claimant remained active and did not limit her activities to avoid potential environmental triggers. The activities documented by the investigators and in the social-media posts include claimant eating at a public restaurant, attending a professional sporting event, shopping, going to a water park, participating in a school trip to an orchard, smoking, and going to a baby shower. In addition, while claimant testified to entering

public restrooms during the arbitration hearing and having trouble breathing due to a body spray, the arbitrator noted that claimant did not display any lingering signs of difficulty or problems from that episode. Indeed, the arbitrator noted that the hearing in this case lasted about 1½ hours, was held in a small room with the windows and doors closed, and required the presence of the parties and several witness. The arbitrator also noted that she was wearing hairspray and was near claimant. Despite these conditions, at no time during the arbitration hearing did claimant show any signs of breathing issues. As noted above, assessing credibility is a matter for the Commission. *Hosteny*, 397 Ill. App. 3d at 674. Given this record, we cannot say that the Commission's finding that the claimant lacked the credibility necessary to prove that her current condition of ill-being is causally related to her industrial accident was against the manifest weight of the evidence.

¶ 44　　In short, the Commission's conclusion that claimant failed to carry her burden of proving a causal connection between her occupational exposure to chemicals on May 7, 2013, and her condition of ill-being after May 8, 2014, was not against the manifest weight of the evidence in light of the lack of a current causation opinion, the gap in claimant's medical treatment, and the Commission's findings regarding claimant's credibility.

¶ 45　　　　　　　　　　　　B. Prospective Medical Care

¶ 46　　Next, claimant argues that the Commission's finding that she was not entitled to prospective medical care was against the manifest weight of the evidence. Claimant's arguments are based on the assertion that the Commission erred with respect to its causal connection findings. As discussed, the Commission's finding that claimant failed to prove a causal connection between her current condition of ill-being and her occupational exposure to chemicals was not against the manifest weight of the evidence. Accordingly, for the same reasons that we rejected claimant's

arguments addressed to the Commission's finding as to causation, we conclude that the Commission did not err in denying prospective medical care.

¶ 47                                C. TTD Benefits

¶ 48    Next, claimant argues that the commission's decision that she was not entitled to TTD benefits after June 7, 2014, was against the manifest weight of the evidence. A claimant is entitled to TTD benefits from the time an injury incapacitates him or her from work until such time as the claimant has recovered or been restored to the permanent character that the injuries will permit. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 542 (2007). The dispositive inquiry is whether the claimant's condition has stabilized, that is, whether he or she has reached maximum medical improvement (MMI). *Interstate Scaffolding, Inc. v. Illinois Workers' Compensation Comm'n*, 236 Ill. 2d 132, 142 (2010). Further, to be entitled to TTD benefits, a claimant must show not only that he or she did not work but that he or she could not work. *Residential Carpentry, Inc. v. Illinois Workers' Compensation Comm'n*, 389 Ill. App. 3d 975, 981 (2009). TTD benefits may be suspended or terminated before an employee reaches MMI if the employee: (1) refuses to submit to medical, surgical, or hospital treatment essential to his or her recovery; (2) refuses to cooperate in good faith with rehabilitation efforts; or (3) refuses work falling within the physical restrictions prescribed by his or her doctor. *Interstate Scaffolding, Inc.*, 236 Ill. 2d at 146-47; *Sharwarko v. Illinois Workers' Compensation Comm'n*, 2015 IL App (1st) 131733WC, ¶ 47. The period during which a claimant is entitled to TTD benefits is a question of fact for the Commission and its resolution will not be disturbed unless it is against the manifest weight of the evidence. *Holocker v. Illinois Workers' Compensation Comm'n*, 2017 IL App (3d) 160363WC, ¶ 35; *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118-20 (1990). A decision is against

the manifest weight of the evidence only if an opposite conclusion is clearly apparent. *Centeno v. Illinois Workers' Compensation Comm'n*, 2020 IL App (2d) 180815WC, ¶ 55.

¶ 49    In concluding that claimant was not entitled to TTD benefits after June 7, 2014, the Commission found that claimant's refusal to accept respondent's offer of employment at the zoo gift shop was not reasonable. According to claimant, however, Dr. Tuteur's testimony clearly established that the position at the zoo gift shop "was never appropriate." Therefore, claimant requests additional TTD benefits from June 8, 2014, through November 21, 2016, the date of the report in which Dr. Tuteur placed claimant at maximum medical improvement. Claimant's position completely ignores the testimony of Dr. Crabtree. Dr. Crabtree unequivocally testified that claimant could work and that any job that did not require exposure to cleaning chemicals would be safe for her. Claimant presented no evidence that the position at the zoo gift shop did not fall within the restrictions imposed by Dr. Crabtree. Indeed, claimant refused the position respondent offered at the zoo gift shop without even attempting it. Whether a claimant has refused employment within his or her work restrictions is a question of fact to be resolved by the Commission, and its determination will not be disturbed on review unless it is against the manifest weight of the evidence. *Otto Baum Company, Inc. v. Illinois Workers' Compensation Comm'n*, 2011 IL App (4th) 100959WC, ¶ 13. Clearly, the Commission determined that claimant had refused employment within the work restrictions imposed by Dr. Crabtree, her treating pulmonologist. As noted, Dr. Crabtree opined that it would be safe for to claimant to work any position that did not expose her to cleaning chemicals. Claimant presented no evidence that the position offered by respondent required such exposure. In light of the foregoing and the Commission's role in assessing the evidence, we are unable to conclude, based on the record before

us, that an opposite conclusion is clearly apparent. Therefore, we conclude that the Commission's decision to terminate claimant's TTD benefits as of June 7, 2014, was not against the manifest weight of the evidence.

¶ 50                                    D. Permanency Benefits

¶ 51     Lastly, claimant argues that the Commission's decision that she suffered permanent partial disability in the amount of a 10% loss of use of the person as a whole was against the manifest weight of the evidence. Claimant's argument in this regard rests entirely upon her argument with respect to the Commission's causation finding. For the same reasons that we rejected claimant's argument addressed to the Commission's finding as to causation, we also reject her request to reconsider the permanency award.

¶ 52                                    III.  CONCLUSION

¶ 53     For the reasons set forth above, we affirm the judgment of the circuit court of Sangamon County, which confirmed the decision of the Commission.

¶ 54     Affirmed.